**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 94-20285

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MIRIAM HENAO POSADO,
PABLO RAMIREZ and
IRMA CLEMENCIO HURTADO,

Defendants-Appellants.

Appeals from the United States District Court
For the Southern District of Texas

(June 20, 1995)

Before POLITZ, Chief Judge, HIGGINBOTHAM and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

This appeal concerns the admissibility of polygraph evidence in a pretrial hearing to suppress forty-four kilograms of cocaine recovered after an airport interdiction and search of the defendants' luggage. The district court refused to consider polygraph evidence offered by the defendants to corroborate their version of events preceding the arrest. Our precedent, with few variations, has unequivocally held that polygraph evidence is inadmissible in a federal court for any purpose. See, Barrel of Fun, Inc. v. State Farm Fire & Cas. Co., 739 F.2d 1028, 1031 (5th

Cir. 1984)(collecting cases).  However, we now conclude that the rationale underlying this circuit's per se rule against admitting polygraph evidence did not survive <u>Daubert v. Merrill Dow Pharmaceutical, Inc.</u>, 113 S. Ct. 2786 (1993).  Therefore, it will be necessary to reverse and remand to the district court for determination of the admissibility of the proffered evidence in light of the principles embodied in the federal rules of evidence and the Supreme Court's decision in <u>Daubert</u>.  Given the sparsity of the record, however, we express no opinion about whether, based on that analysis, the evidence possesses sufficient evidentiary reliability and relevance to be admissible in the suppression hearing on remand.

### BACKGROUND

Defendants  Miriam  Henao  Posado,  Pablo  Ramirez and Irma Clemencio Hurtado were each indicted and subsequently convicted of one count of conspiracy to possess and one count of possession with intent to distribute in excess of five kilograms of cocaine in violation of 21 U.S.C. §§ 841 (a)(1), 841(b)(a)(A) and 846.  Prior to trial the defendants moved to suppress the cocaine found in their luggage and certain post-arrest statements.  At issue was whether the defendants validly consented to a search of their luggage.  The prosecution sought to justify the search solely on the basis of consent, offering a Spanish-language consent form executed by all three defendants.[1]  The three defendants, by way of

---

[1]As counsel for the government stated in oral argument, this case  was  treated  "only  as  a  consent  case."   It  would  be inappropriate, on the basis of the present record, to determine

2

affidavit, claimed (1) that they were not asked to consent and did not consent, either orally or in writing, to the search of their luggage until <u>after</u> the bags had been opened, (2) that they were told they were under arrest before their bags were searched, and (3) that they were not given <u>Miranda</u> warnings before the bags were opened. Defendants contended that the consent was invalid either (1) because it was given after the bags were opened, or (2) because it followed and was tainted by an illegal arrest without probable cause.

### Events Leading up to the Search

On September 17, 1993, Miriam Henao Posado, Pablo Ramirez and Irma Clemencio Hurtado arrived at Houston Intercontinental Airport in a maroon car driven by an unidentified third party. As they unloaded their baggage, they were observed by Houston Police Department (HPD) Officers Rodriguez and Furstenfeld and an agent with the Drug Enforcement Agency (DEA). The officers became suspicious that the defendants might be carrying narcotics based on certain characteristics of the defendants' baggage and behavior. Based on those suspicions and prior to confronting the defendants, the officers retrieved from the airline the three suitcases checked by the defendants and "prepped" one of the bags. "Prepping" involves squeezing the sides of a bag, which causes the odor of

---

whether independent probable cause existed for the search. We note, however, that that issue may well be appropriate for consideration on remand.

whatever is contained inside to be emitted. In this case, the officers detected fabric softener, which is often used by narcotics traffickers to mask the odor of narcotics in transport.

Shortly thereafter, the two HPD officers approached the defendants in the snack bar area, identified themselves as police officers and asked the defendants for their tickets and identification. When it became apparent that none of the defendants spoke English, Officer Rodriguez conversed with them in Spanish. Neither Posado nor Hurtado were carrying any identification, and the name on the identification produced by Ramirez did not match either his ticket or the name placed on the baggage tag. Ramirez' identification was examined and then returned to him.

When asked about luggage, the defendants responded by indicating three carry-on bags. When Officer Rodriguez pointed to the baggage tags stapled inside the defendants' ticket folders, one of the defendants conceded that they had checked three suitcases. Here the stories diverge. Officer Rodriguez testified that, after expressing some concern about missing their flight, the defendants agreed to accompany him downstairs so that he could inspect the luggage. He also testified that he advised the defendants at that time that they were free to leave. The defendants testified that Officer Rodriguez never informed them that they were free to leave and that they were under the impression that they were not free to leave. See Florida v. Bostick, 111 S. Ct. 2382, 2389 (1991) (seizure occurs when police conduct would communicate to a

4

reasonable person that they are not free to leave).  The defendants also testified that Officer Rodriguez insisted they accompany him despite protests from defendant Ramirez that the delay would cause them to miss their scheduled flight.  Defendant Ramirez testified that the officers took and maintained possession of two of their carry-on bags at that time.  Once downstairs, the two HPD officers and the three defendants were joined by the DEA agent who had possession of the three larger suitcases checked by the defendants.  The defendants were asked for keys to the padlocks, which they did not have.

The officers testified that immediately after asking for keys, Officer Rodriguez secured the defendants' consent to search, both orally and in writing.  Officer Rodriguez also testified that he advised the defendants in Spanish that they were not required to consent.  Next, Officer Furstenfeld unsuccessfully attempted to open the suitcases using a master set of luggage keys.  Only then, according to the officers, were the padlocks pried open and the bags searched.

The defendants testified that immediately after they were asked for keys, Officer Furstenfeld began trying to open the suitcases with the master set of keys.  When he could not, Officer Furstenfeld pried open the padlock and opened the zipper slightly. At that point, the defendants claim, Officer Furstenfeld stopped suddenly and ran upstairs.  In his absence, the DEA agent continued opening the suitcase with a pen knife, looked inside and announced that it contained drugs.  At that point, the defendants testified,

5

Officer Furstenfeld returned with the consent form and it was executed by the defendants. Afterwards, the other two suitcases were opened.

## The Polygraph Examinations

Perceiving that the suppression hearing would amount to a "swearing match" between the three officers and the three defendants (that the defendants would be likely to lose), the defendants arranged to submit to polygraphs to establish the truth of the assertions in their affidavits. Well before the tests were given, counsel for the defendants contacted the prosecution and extended the opportunity to participate in the tests. The defendants also offered to stipulate that the results would be admissible in any way the government wanted to use them, at trial or otherwise. The prosecution declined this opportunity.

Subsequently, the defendants were examined by polygraph experts Paul K. Minor and Ernie Hulsey. In separate examinations each defendant was asked the following questions and each gave the following answers:

A. Before opening that first bag, did any police official ever ask for permission to search any of those bags? No.

B. Before searching your luggage, were you told that you were under arrest? Yes.

C. At the airport, were you ever told that you were free to leave? No.

D. Did you deliberately lie in your affidavit? No.

E. Before opening your bags, did the police officials advise you of your Miranda rights? No.

6

Both Minor and Hulsey concluded that in each case "deception was not indicated."  Thereafter, the defendants moved for an order allowing Minor and Hulsey to testify regarding the results of the three tests at the pretrial suppression hearing or, in the alternative, for a hearing on the admissibility of polygraph results as expert evidence under the Federal Rules of Evidence and the standards enunciated by the Supreme Court in Daubert v. Merrill Dow Pharmaceutical, 113 S. Ct. 2786 (1993).  Defendants' proffer included the reports on the polygraph examinations as well as the curriculum vitae for both Minor and Hulsey.  In support of their request for a Daubert hearing on the issue, defendants submitted the affidavit of another polygraph expert, Dr. Stan Abrams, Ph.D., to establish that polygraph technique possesses sufficient scientific validity to be admissible.

At the beginning of the subsequent suppression hearing, the district court summarily refused to consider the polygraph testimony and also refused to consider whether the testimony was reliable and relevant under the Federal Rules of Evidence, stating:

> I am a great believer in polygraph, that polygraph technique, I think it's extremely effective as a law enforcement tool.  I do not believe, however, that it belongs in the courtroom, either before the Court or before the jury, for several reasons, one of which is that it will lead to an impossible situation where we will have to hear polygraph experts on both sides, and we'll get into the same battle of experts that we get into in so many areas of the law.
> I am very concerned that it does have some valid use in determining whether people are likely to be truthful or likely not to be truthful, however, I think it opens up some policy questions that belong either to Congress or to the appellate courts to resolve before we get into it here in the courtroom.

7

At the conclusion of the suppression hearing, the district court denied the defendants' motion to suppress, holding that the defendants knowingly and voluntarily consented to a search of their luggage before any of the bags were opened, and that the defendants were not arrested until after the bags were searched. Shortly after the hearing, the defendants and the government entered into a stipulation that the defendants would be tried by the court on the evidence presented at the suppression hearing. All three defendants were convicted on both the conspiracy to possess and possession counts, and this appeal followed.

**APPLICABLE LAW**

On appeal, the defendants contend that <u>Daubert</u> required the district court to conduct a hearing on the admissibility of the polygraph evidence as expert testimony under Federal Rule of Evidence 702. Defendants also argue that the district court erred in refusing to consider polygraph evidence where it was offered solely for use in a pretrial suppression hearing, relying on <u>Bennett v. City of Grand Prairie, Texas</u>, 883 F.2d 400 (5th Cir. 1989). Finally, the defendants maintain that the district court erroneously found that consent was knowing and voluntary, and therefore valid. The government concedes that a per se rule against admitting polygraph evidence, without further inquiry, is not viable after <u>Daubert</u>, but argues that the proffered evidence in this case was properly excluded under rule 403.

We reject the defendants' argument that <u>Bennett</u> controls. <u>Bennett</u> held that it was not error for a magistrate to consider an

8

affidavit referring to polygraph results, along with other evidence, to determine whether there was probable cause to issue an arrest warrant. 883 F.2d at 405-06. That case does not extend so far as to control the admissibility of polygraph testimony in all pretrial proceedings. Daubert, along with the Federal Rules of Evidence, provide the guiding principles.

We also reject the government's invitation to short-circuit the Daubert analysis by finding that the district court implicitly relied on Rule 403 to exclude the evidence. We conclude that the district court applied a per se rule against admitting polygraph evidence. Even the government concedes that that rule is no longer viable after Daubert. Therefore, the case must be remanded.

**From Frye to Daubert - Rule 702**

Before Daubert, the standard for determining the admissibility of scientific or technical evidence in our circuit was the Frye "general acceptance" test, which required the proponent to demonstrate that the science or technology relied upon enjoyed general acceptance in the relevant scientific or technical field from which it arose. The Frye test originated in a short and citation-free case in which a criminal defendant attempted to introduce what Daubert called a "crude predecessor" of the polygraph to demonstrate his innocence in a murder trial. Daubert, 113 S. Ct. at 2793; Frye v. United States, 293 F. 1013 (D.C. Cir. 1923). Frye thus became the seminal polygraph case, and many of our precedents discussing polygraph or similar evidence either cite Frye or conclude that such evidence is unreliable because the

9

polygraph does not enjoy general acceptance and use.  See e.g.,

Barrel of Fun, Inc. v. State Farm Fire & Cas. Co., 739 F.2d 1028,

1031 (5th Cir. 1984); United States v. Martino, 648 F.2d 367, 390

(5th Cir. 1981); United States v. Cochran, 499 F.2d 380, 393 (5th

Cir. 1974), cert. denied, 419 U.S. 1124 (1975); United States v.

Gloria, 494 F.2d 477, 483 (5th Cir.), cert. denied, 419 U.S. 995

(1974); United States v. Frogge, 476 F.2d 969, 970 (5th Cir.),

cert. denied, 414 U.S. 849 (1973).

Daubert expressly rejected the "austere" Frye standard,

holding that the Frye approach was superseded by adoption of the

Federal Rules of Evidence.  113 S. Ct. at 2794.  In its stead the

Supreme Court outlined a "flexible" inquiry driven primarily by

Federal Rules of Evidence 401, 402, 403, and 702.  After discussing

the "liberal thrust" of the federal rules, as reflected in Rules

401 and 402, the Court noted that nothing in Rule 702, which

governs the admissibility of expert testimony, makes "general

acceptance" an absolute prerequisite to admissibility.[2]  What that

rule does require, the Court held, is that the trial judge make

initial determinations under Rule 104(a)[3] that the proffered

---

[2] Rule 702 governing expert testimony provides:
If scientific, technical or other specialized knowledge
will assist the trier of fact to understand the evidence
or to determine a fact in issue, a witness qualified as
an expert by knowledge, skill, experience, training, or
education, may testify thereto in the form of an opinion
or otherwise.

[3]Rule 104(a) provides:
Preliminary questions concerning the qualification of a
person to be a witness, the existence of a privilege, or
the admissibility of evidence shall be determined by the
court, subject to the provisions (b) [pertaining to

10

evidence possesses sufficient evidentiary reliability to be admissible as "scientific, technical, or other specialized knowledge" and that the proffered evidence is relevant in the sense that it will "assist the trier of fact to understand the evidence or to determine a fact in issue." Daubert, 113 S. Ct. at 2796.

Whether evidence assists the trier of fact is essentially a relevance inquiry. Daubert, 113 S. Ct. at 2795-96. To be "helpful" under Rule 702, the evidence must possess validity when applied to the pertinent factual inquiry.[4] If polygraph technique is a valid (even if not certain) measure of truthfulness, then there is no issue of relevance. The defendants' polygraph answers, which are consistent with their testimony, tend to prove that they did not consent to a search of their bags until after the bags were searched. That fact is clearly relevant, because it tends to prove that the search was not valid.

Evidentiary reliability, or trustworthiness, is demonstrated by a showing that the knowledge offered is "more than speculative

conditional admissions]. In making its determination it is not bound by the rules of evidence except those with respect to privileges."

[4]The example given by the Supreme Court demonstrates that particular evidence may have validity for some purposes and not for others:

The study of the phases of the moon, for example, may provide valid scientific "knowledge" about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact. However (absent credible grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night.

113 S. Ct. at 2796.

11

belief or unsupported speculation." Daubert, 113 S. Ct. at 2795. Certainty is not required, but the knowledge asserted must be based on "good grounds." Id. For scientific knowledge, there should be proof that the principle supports what it purports to show, i.e. that it is valid. Id. Validity can be measured by several factors, including whether the theory or technique can be tested and whether it has been subjected to peer review or publication. Id. at 2796-97. For particular techniques, such as polygraph or voice identification, the known or potential rate of error may be helpful in making the validity determination. Id. at 2797. Finally, although it is not dispositive, the extent to which a particular theory or technique has received general acceptance may be relevant to whether it is scientifically valid. Id.

What remains is the issue of whether polygraph technique can be said to have made sufficient technological advance in the seventy years since Frye to constitute the type of "scientific, technical, or other specialized knowledge" envisioned by Rule 702 and Daubert. We cannot say without a fully developed record that it has not.

Even before Daubert, this court's view of polygraph evidence had expanded somewhat. See Bennett, 883 F.2d at 405-06 (magistrates may consider polygraph evidence when determining whether probable cause to issue an arrest warrant exists); United States v. Lindell, 881 F.2d 1313, 1326 (5th Cir. 1989) ("[i]mpeachment evidence includes the results of a polygraph test" for purposes of the Brady rule), cert. denied sub nom. Kinnear v.

12

United States, 493 U.S. 1087 (1993). In 1980, twelve judges of this court agreed that whether polygraph was generally accepted would be subject to reconsideration given a proffer tending to show that polygraph technique had improved in the years since Frye. United States v. Clark, 622 F.2d 917, 917 (5th Cir. 1980) (en banc) (Gee, J., concurring), cert. denied, 449 U.S. 1128 (1981).[5] In 1984, we recognized the considerable controversy surrounding our circuit's continued adherence to a per se rule against polygraph evidence, but concluded that en banc consideration would be required to change our existing precedent. Barrel of Fun, Inc. v. State Farm Fire & Cas. Co., 739 F.2d 1028, 1031 n.8 (5th Cir. 1984). After Daubert, a per se rule is not viable. Because no panel has squarely addressed the issue of polygraph admissibility since Daubert, en banc consideration is not required for this decision.

There can be no doubt that tremendous advances have been made in polygraph instrumentation and technique in the years since Frye. The test at issue in Frye measured only changes in the subject's systolic blood pressure in response to test questions. Frye v. United States, 293 F. at 1013. Modern instrumentation detects

---

[5]Several other circuits went further by granting the district court limited discretion to consider polygraph evidence in certain circumstances. E.g., United States v. Johnson, 816 F.2d 918, 923 (3d Cir. 1987); United States v. Flores, 540 F.2d 432, 436-37 (9th Cir. 1976); United States v. Mayes, 512 F.2d 637, 648 n.6 (6th Cir.), cert. denied, 422 U.S. 1008 (1975); United States v. Infelice, 506 F.2d 1358, 1365 (7th Cir. 1974), cert. denied sub nom., Garelli v. United States, 419 U.S. 1107 (1975); see also United States v. Piccinonna, 885 F.2d 1529, 1532-35 (11th Cir. 1989)(summarizing various circuit approaches to polygraph admissibility).

changes in the subject's blood pressure, pulse, thoracic and abdominal respiration, and galvanic skin response.[6] Current research indicates that, when given under controlled conditions, the polygraph technique accurately predicts truth or deception between seventy and ninety percent of the time.[7] Remaining controversy about test accuracy is almost unanimously attributed to variations in the integrity of the testing environment and the qualifications of the examiner.[8] Such variation also exists in

---

[6]See 22 CHARLES A. WRIGHT & KENNETH W. GRAHAM, FEDERAL PRACTICE AND PROCEDURE § 5169 at 95 n.7 (1978); Ronald J. Simon, *Adopting a Military Approach to Polygraph Evidence Admissibility: Why Federal Evidentiary Protections Will Suffice*, 25 TEX. TECH L. REV. 1055, 1059 (1994).

[7]Bennett, 883 F.2d at 405 ("[p]olygraph exams, by most accounts, correctly detect truth or deception 80 to 90 percent of the time"). Even the most ardent polygraph detractors cite accuracy rates of 70 percent. See Brown v. Darcy, 783 F.2d 1389, 1395 n.12 (9th Cir. 1986) (collecting studies). In 1983 the Office of Technology Assessment (OTA) conducted a comprehensive inquiry for the United States Congress. That inquiry found that accuracy ranged anywhere from 58 to 98 percent. However, only ten of the thirty studies reviewed met even minimal standards for scientific validity in terms of the examiners and techniques used. Simon, *supra* note 6, 25 TEX. TECH L. REV. at 1062-63. A more recent comprehensive review of the OTA data reported that accuracy rates were much higher for studies which most resembled realistic polygraph practice, a factor which could explain as much as 65% of the observed variation in detection rates. See John E. Kircher, et al., *Meta-Analysis of Mock Crime Studies of the Control Question Polygraph Technique*, 12 LAW & HUMAN BEHAVIOR 79 (1988); see also David C. Raskin, *The Polygraph in 1986: Scientific, Professional and Legal Issues Surrounding Application and Acceptance of Polygraph Evidence*, 1986 UTAH L. REV. 29, 72 (1986) ("existing literature suggests an accuracy of 90% or higher when examinations are conducted to assess the credibility of suspects in criminal investigations."); 1 MCCORMICK ON EVIDENCE § 206 at 909-11 (John William Strong ed., 4th ed. 1992) and sources cited therein.

[8]See United States v. Piccinonna,885 F.2d 1529, 1540-41 (11th Cir. 1989) (Johnson, J., concurring in part and dissenting in part) (citing research indicating that examiner expertise and test procedure affects accuracy); Simon, *supra* note 6, 25 Tex. Tech L.

14

many of the disciplines and for much of the scientific evidence we routinely find admissible under Rule 702. See 1 McCormick on Evidence § 206 at 915 & n. 57. Further, there is good indication that polygraph technique and the requirements for professional polygraphists are becoming progressively more standardized.[9] In addition, polygraph technique has been and continues to be subjected to extensive study and publication.[10] Finally, polygraph is now so widely used by employers and government agencies alike.

To iterate, we do not now hold that polygraph examinations are scientifically valid or that they will always assist the trier of fact, in this or any other individual case. We merely remove the obstacle of the per se rule against admissibility, which was based on antiquated concepts about the technical ability of the polygraph

Rev. at 1063-66 (discussing the affect of test integrity, countermeasures, and examiner competence on polygraph accuracy).

[9]See Piccinonna, 885 F.2d at 1533 & n. 13. At least 30 states require licenses or regulate polygraphists. Raskin, *supra* note 7, 1986 Utah L. Rev. at 68. Dr. Abrams reports that the American Polygraph Association (APA), which has about 2,500 members, accredits schools of polygraphy, screens its members and administers written and oral tests to graduates to assure an established level of competency. Standard test protocol calls for pre-test collection of data, a pre-test interview, administration of the test questions (usually in a control question format) and a post-test interview. In addition, the APA sanctions members who do not follow enumerated testing procedures. See Charles M. Sevilla, *Polygraph 1984: Behind the Closed Door of Admissibility*, 16 U. West L.A. L. Rev. 5, 18-20 (1984); Raskin, *supra* note 7, 1986 Utah L. Rev. at 66-69 (both discussing the need for additional measures to professionalize polygraph practice, which would have the effect of increasing overall accuracy rates). In this case, counsel for the defendants conceded at oral argument that the defendants' proffer sufficiently established reliability.

[10]See 22 Charles A. Wright & Kenneth W. Graham, Federal Practice & Procedure § 5169 at 92 n. 2 (collecting an impressive bibliography).

and legal precepts that have been expressly overruled by the Supreme Court.

## Rule 403 as Gatekeeper

Assuming that polygraph evidence satisfies the requirements of Rule 702 does not end the inquiry. Other evidentiary rules, such as Rule 403, may still operate to exclude the evidence. Daubert, 113 S. Ct. at 2797-98. While not discussed at length in Daubert, the presumption in favor of admissibility established by Rules 401 and 402, together with Daubert's "flexible" approach, may well mandate an enhanced role for Rule 403 in the context of the Daubert analysis, particularly when the scientific or technical knowledge proffered is novel or controversial. See Conti v. Comm'r of Internal Revenue, 39 F.3d 658 (6th Cir. 1994) (excluding polygraph evidence on the basis of Rule 403), cert. denied, 115 S. Ct. 1793 (1995).

Aside from Frye, the traditional objection to polygraph evidence is that the testimony will have an unusually prejudicial effect which is not justified by its probative value, precisely the inquiry required of the district court by Rule 403. See Bennett, 883 F.2d at 404; Brown v. Darcy, 783 F.2d 1389, 1396 (9th Cir. 1986). In the context of this case and on the present record, there are several factors that may operate to counterbalance the potential prejudicial effect of this testimony. First, the prosecution was contacted before the tests were conducted and offered the opportunity to participate in the exams, including stipulating as to any limited use for the evidence. In such a

16

case, both parties have a risk in the outcome of the polygraph examination, simultaneously reducing the possibility of unfair prejudice and increasing reliability. Second, the evidence was not offered at trial before a jury, but in a pretrial hearing before the district court judge. A district court judge is much less likely than a lay jury to be intimidated by claims of scientific validity into assigning an inappropriate evidentiary value to polygraph evidence. Bennett, 883 F.2d at 405. We have consistently held that the rules of evidence are relaxed in pretrial suppression hearings. See FED. R. CIV. P. 104(a); United States v. DeLaFuente, 548 F.2d 528 (5th Cir.), cert. denied sub nom. Stewart v. United States, 431 U.S. 932 (1977); United States v. Lee, 541 F.2d 1145 (5th Cir. 1976).

We note also that there are factors in this record which substantially boost the probative value of this evidence. The evidence at the suppression hearing essentially required the district court to decide between the story told by the officers and that told by the defendants, a not unusual situation, and perhaps not sufficient alone to justify admission of "tie-breaker" evidence carrying a high potential for prejudicial effect. In this case, however, there was more. Because Officer Rodriguez was the only Spanish-speaking officer on the scene, he alone could testify as to what the defendants were told and as to their understanding of whether they were under arrest or whether they were consenting to a search of their baggage. Although Officer Rodriguez testified that he explained the consent form to the defendants, he was unable

17

to read the consent form (printed in Spanish) to the court at both the probable cause hearing and the suppression hearing. There was also evidence calling the officers' recollection of events into question. For example, Officer Rodriguez testified incorrectly at the probable cause hearing that the defendants were travelling with one-way tickets, a fact which he said contributed to his reasonable suspicion that the defendants were carrying drugs. The defendants were in fact holding round-trip tickets. In addition, the defendants offered the testimony of a disinterested witness, an airline employee, who contradicted the officers' version of the events surrounding their retrieval of the defendants' bags from the airline prior to the search. Finally, the defendants introduced at the suppression hearing an order from a similar case in another district court in the Southern District involving Officer Rodriguez. In that case, the district court judge found that Officer Rodriguez' version of the events leading up to the search in that case was "untruthful" and therefore suppressed evidence obtained after the defendants allegedly consented to the search. Taken individually, each one of these inconsistencies can be explained and may seem inconsequential. Taken together, however, we believe that they can be said to enhance the need for evidence, and therefore its probative value, for clarifying which of the competing versions of what happened that day is true.

## CONCLUSION

The district court essentially applied the per se rule against admitting polygraph evidence established by our earlier

18

precedent. Because the district court's assessment of the proffered polygraph evidence under the Daubert standard may well affect the other issues raised by this appeal, it is inappropriate at this time to address the district court's decision to exclude the polygraph evidence from its consideration on the motion to suppress or its fact finding that the search was supported by valid consent. Those issues can be adequately addressed on subsequent appeal, if necessary.

It is with a high degree of caution that we have today opened the door to the possibility of polygraph evidence in certain circumstances. We may indeed be opening a legal Pandora's box. However, that the task is full of uncertainty and risk does not excuse us from our mandate to follow the Supreme Court's lead. Rather, "[m]indful of our position in the hierarchy of the federal judiciary, we take a deep breath and proceed with this heady task." Daubert v. Merrell Dow Pharmaceutical, Inc., 43 F.3d 1311, 1316 (9th Cir. 1995) (on remand from the Supreme Court).

Nor are we unaware that our opinion today may raise as many questions as it answers. We leave much unsaid precisely because we believe that the wisdom and experience of our federal district judges will be required to fashion the principles that will ultimately control the admissibility of polygraph evidence under Daubert.

For the foregoing reasons, the district court's ruling on the motion to suppress is REVERSED, the defendants' convictions are VACATED and the case is REMANDED to the district court for

consideration of the evidentiary reliability and relevance of the polygraph evidence proffered by the defendants under the principles embodied in the Federal Rules of Evidence and the Supreme Court's decision in <u>Daubert</u>.