Jessie ULMER and Robert Savoie

v.

**STATE FARM FIRE & CASUALTY COMPANY, et al.**

Civ. A. No. 94–1998.

United States District Court,
W.D. Louisiana,
Alexandria Division.

Sept. 13, 1995.

---

300

A. Dale Smith, Smith Farrar & Johnson, Ball, LA, for plaintiffs.

John Gutierrez McLure, James Berry Reichman, McLure Pickels & Reichman, Alexandria, LA, for defendants.

### RULING

LITTLE, District Judge.

Before this court are plaintiffs' motion in limine and supplemental motion in limine requesting a ruling on the admissibility of evidence relating to polygraph tests administered to them by Brad Cook, a polygraphist with the Louisiana Department of Public Safety, at the request of and under the supervision of Mike Neck, an investigator with the Office of the Louisiana State Fire Marshall. Finding evidence concerning the administration and results of these polygraph tests to be relevant under the Federal Rules of Evidence, we GRANT plaintiffs motions in

limine and rule that the plaintiffs may question Mr. Neck and Mr. Cook subject to the qualifications set forth below.

### I

The evidentiary matters at issue arise out of a fire that destroyed the residence and much of the personal property of plaintiffs Jessie Ulmer and Robert Savoie on 21 April 1994. At the time of the fire, plaintiffs' home and personal property were insured under a policy issued by defendant State Farm Fire and Casualty Company. After plaintiffs filed a sworn proof of loss with State Farm, thereby making a formal claim of damages under the terms of the policy, representatives of State Farm alleged that the fire was caused by plaintiffs themselves or caused by others at their direction.

As a result of these arson allegations, the Office of the Louisiana State Fire Marshal launched an investigation of the fire and any role that plaintiffs may have had in it. In the course of that investigation, Mike Neck, an investigator with the Fire Marshal's Office, requested that plaintiffs undergo polygraph examinations. Plaintiffs readily agreed. The tests were administered by Brad Cook, a certified polygraphist from the Louisiana Department of Public Safety, and were supervised by Mr. Neck. The polygraphist determined that the examination results corroborated the plaintiffs' denials of any involvement in the fire.

As a result of these examinations and other information gained during his investigation, Mr. Neck concluded that there was insufficient evidence to justify further investigation of the plaintiffs' role in the fire and advised plaintiffs that they were no longer suspects in the alleged arson. Although an adjuster from State Farm was informed of the polygraph results and the Fire Marshal's conclusions, State Farm continued to refuse to pay any benefits under the policy. Plaintiffs subsequently filed suit against State Farm, claiming damages for breach of contract and breach of an insurer's statutory duty to deal with its insureds in good faith.[1]

1. Plaintiffs also alleged tortious defamation    against State Farm's claim representative, Rob-

## II

Until recently, the United States Fifth Circuit Court of Appeals, following the seminal case of *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), has adhered to a strict rule barring the introduction of polygraph evidence for almost any purpose in federal court in either criminal or civil trials. See *Barrel of Fun, Inc. v. State Farm Fire & Cas. Co.,* 739 F.2d 1028, 1031 (5th Cir.1984); *United States v. Clark,* 598 F.2d 994, 995 (5th Cir. 1979). The court's few exceptions to this rule permitted polygraph evidence only in narrowly prescribed contexts. See *Bennett v. City of Grand Prairie, Texas,* 883 F.2d 400, 405–06 (5th Cir.1989) (in magistrate's determination of whether probable cause to issue an arrest warrant exists); *United States v. Lindell,* 881 F.2d 1313, 1326 (5th Cir.1989) (impeachment evidence includes polygraph results for purposes of *Brady* rule), *cert. denied sub nom.* 493 U.S. 1087, 110 S.Ct. 1152, 107 L.Ed.2d 1056 (1990). During the 1980's, however, other federal circuits began to adopt more flexible approaches giving trial courts some discretion to admit polygraph evidence in specific circumstances. See *United States v. Piccinonna,* 885 F.2d 1529, 1532–35 (11th Cir.1989); *United States v. Posado,* 57 F.3d 428, 433 n. 5 (5th Cir.1995). Despite this extra discretion in some jurisdictions, most trial courts remained hostile to the admission of polygraph evidence. See Charles A. Wright & Kenneth W. Graham, 22 *Federal Practice & Procedure* § 5169 n. 67 (Supp.1995).

Most recently, the United States Supreme Court's conclusion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, ——, 113 S.Ct. 2786, 2794, 125 L.Ed.2d 469, 480 (1993), that the *Frye* "general acceptance" test could no longer be viewed as an absolute prerequisite to the admissibility of expert testimony on scientific or technical subjects cast serious doubt on the Fifth Circuit's traditional adherence to a strict per se rule of inadmissibility for polygraph evidence. In *United States v. Posado,* 57 F.3d 428, 429 (5th Cir.1995), a case involving the admissibility of polygraph evidence proffered in a

pre-trial suppression hearing concerning an allegedly invalid search and seizure, the Fifth Circuit responded to *Daubert* and held that its former per se exclusionary rule is no longer tenable. Specifically, the court found that *Daubert* and the Federal Rules of Evidence require a three step approach to the question of whether polygraph evidence may be admitted in federal trial courts.

Initially, the trial court must determine under Rule 104(a) whether the proffered evidence "possesses sufficient reliability to be admissible as 'scientific, technical, or other specialized knowledge.'" *Id.* at 432 "Evidentiary reliability, or trustworthiness," the court explained, "is demonstrated by a showing that the knowledge offered is 'more than speculative belief or unsupported speculation,'" *Id.* (quoting *Daubert,* —— U.S. at ——, 113 S.Ct. at 2795), or, put in a more positive light, that the knowledge is based on "good grounds." *Id.* Factors that a court may consider in assessing any proffered evidence's scientific and technical validity include: (1) whether the theory or technique on which the evidence is based can be (and has been) tested; (2) whether the theory or technique has been subject to peer review or publication; (3) the extent to which the theory or technique has received general acceptance; and (4) specifically in the case of polygraph examinations, the known or potential rate of error. *See id.*

Once a trial court finds that proffered evidence is scientifically or technically valid, the court must also ask whether "the proffered evidence is relevant in the sense that it will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Id.* at 432 (quoting *Daubert,* —— U.S. at ——, 113 S.Ct. at 2796). The *Posado* decision implies that this Rule 401 relevance inquiry may, in fact, be a proforma one in the case of polygraph evidence once evidentiary reliability is established. "If polygraph technique is a valid (even if not certain) measure of truthfulness," the court found, "then there is no issue of relevance." *Id.* at 433. In other words, valid polygraph evidence will always be relevant if it tends to support or under-

---

ert G. Lorimer, and against State Farm itself. This court dismissed those claims, however, in its

previous ruling denying plaintiffs' motion to remand this case to state court.

mine the credibility of a witness whose version of events is contested at trial.[2]

Finally, as *Posado* demonstrates, a trial court must also determine under Rule 403 whether the polygraph evidence will have an "unusually prejudicial effect not justified by its probative value." *Posado,* 57 F.3d at 435. In analyzing the facts and circumstances before it in *Posado,* the Fifth Circuit described several factors that a trial court should consider in making this final Rule 403 determination.

First, the trial court should consider the circumstances surrounding the administration of the polygraph exam, and in particular, whether, and the degree to which, "both parties have a risk in the outcome of the polygraph examination." *Id.* at 435 In *Posado,* for example, the court noted that the party opposing introduction of the polygraph evidence, the prosecution in that case, had been contacted prior to the examinations and given an opportunity to participate in them. *Id.* In such circumstances, the court found, the risk of unfair prejudice was reduced while the reliability of the evidence was enhanced.

Next, the trial court should consider the occasion and forum in which the polygraph evidence is sought to be introduced. *Id.* at 435. Again in *Posado* the criminal defendants offered polygraph evidence not at a trial before a jury, but in a pre-trial hearing before a district court judge. In such a situation, the court suggested, the risk of unfair prejudice would be substantially reduced.

Finally, the trial court should carefully evaluate "the need for [polygraph] evidence," and, specifically, whether the evidence helps clarify which one of several competing versions of a contested event or fact is true. *Id.* at 435. The court in *Posado* found that there was an enhanced need for polygraph evidence in that case because several inconsistencies in the crucial testimony of the arresting police officer already cast doubt on his version of the search and seizure that were

also the subject of the polygraph examinations at issue. *Id.*

Admittedly, the Fifth Circuit's teaching with respect to this last factor appears to be somewhat counter-intuitive: If the polygraph evidence is merely "tie breaker" evidence, i.e. the trier of fact is required to decide between stories relatively equal in plausibility, the evidence may have less probative value compared to its prejudicial effect. On the other hand, if one side's story is already subject to some suspicion, then the polygraph evidence may have more probative value in helping to resolve those doubts one way or another. The basis for the court's curious instruction here may originate in what some commentators describe as a latent anxiety underlying many courts' former resistance to polygraphs: "the Man v. Machine psychology" and specifically the jurisprudential intuition that polygraph machines represent an "invasion of human autonomy and dignity and thus a denial of due process." Charles A. Wright & Kenneth Graham, 22 *Federal Practice & Procedure* § 5169, at 99 (1978). If the case is truly close, the court may be thinking, it may be preferable to leave questions of credibility to be determined by human sensibilities alone. But if one side already has raised serious doubts about the other's version of events, then a little mechanical help to the trier of fact will not hurt.

### III

Turning to the facts and circumstances of this case, we must first evaluate the proffered polygraph evidence here and determine whether it is sufficiently reliable or based on "good grounds." *Posado,* 57 F.3d at 432. At the outset, defendant State Farm raises two important questions concerning the reliability of the evidence at issue here. First, it notes that the plaintiffs have not listed an expert other than the certified polygraphist, Mr. Cook, who administered the examinations to testify concerning the reliability of polygraphs in general or the particular methods used in these examinations. The defendant

---

**2.** The Fifth Circuit declined to hold outright that polygraph examinations are scientifically valid or that they will always assist the trier of fact, but it did discuss developments in the field at length and noted "that tremendous advances have been made in polygraph instrumentation and technique in the years since *Frye."* *Posado,* 57 F.3d at 434.

also notes that no report of the examiner, as an expert, has been provided to counsel for State Farm as required by this court's pre-trial order.

While this court takes these objections seriously, we are unwilling, at this point at least, to declare that the polygraph examinations conducted by Mr. Cook, at the request of Mr. Neck, lack sufficient evidentiary reliability to satisfy the standards elaborated in *Posado* for step one of its required analysis. This court notes that polygraph theory and technique have been tested, have been subject to peer review and extensive publication, and have been shown to have a not unreasonable potential rate of error. *See Posado*, 57 F.3d at 434 ("Current research indicates that, when given under controlled conditions, the polygraph technique accurately predicts truth or deception between seventy and ninety percent of the time."); *but cf.* Rex Beaker, *Not Guilty by Reason of Polygraph*, 16 U.W.L.A. L.Rev. 27, 34 (1984) (claiming that polygraph accuracy rate is no better than 50–50). Moreover, the court notes that polygraph examinations are now widely used in industry and government and that polygraph techniques and professional polygraphists have increasingly become subject to state regulation and licensure. *Posado*, 57 F.3d at 434 n. 9 (at least 30 states now license or regulate polygraphists).

Most importantly, this court notes that the polygraph examinations at issue here were administered and interpreted by a polygraphist certified to perform these functions by the State of Louisiana through its Polygraphist Act. *See* LSA–R.S. 37:2831–2854 (West 1995). To be certified under the act, a polygraphist must have received no less than 270 hours of training, completed a six month internship, and passed an examination given by the Louisiana State Polygraphy Board. *Id.* at § 2838. Further, the polygraphist may only administer polygraph examinations by employing instrumentation able to detect a number of specified physical conditions. *Id.* at § 2834. The fact that Mr. Cook was an employee of the Louisiana Office of Public Safety and administered the test at the request of a state law enforcement official further bolsters the examinations' reliability in the eyes of this court. In short, the court is convinced that the testimony concerning polygraph examinations proffered by plaintiffs in this case is supported by sufficient indicia of reliability to satisfy Rule 702 as interpreted by *Daubert* and *Posado*.

Having found that the polygraph examinations at issue here are presumptively reliable under Rule 702 and the standards set forth in *Posado*, and are, therefore, relevant under Rule 401, this court now finally considers whether the prejudicial effect of the proffered polygraph evidence will substantially and unfairly outweigh its probative value and thus merit exclusion under Rule 403.

First, with respect to the circumstances surrounding the administration of the polygraph examinations, State Farm claims that, unlike the objecting party in *Posado*, it was not given an opportunity to participate in the examinations or select the examiner and, therefore, faces a higher risk of prejudice. While it is true that State Farm may not have been "asked" to participate in the examinations, it nevertheless set the Fire Marshal's investigation in motion by raising the allegations of arson against the plaintiffs in the first place. Furthermore, it is hard to imagine that State Farm would have found or selected a more disinterested examiner than the one who in fact administered these exams—a certified polygraphist employed by the State Office of Public Safety and working at the request of the State Fire Marshal. Of course, the plaintiffs clearly did not "select" the polygraphist who examined them either. To the contrary, they put themselves at substantial risk by submitting to the examinations. In sum, the court finds that the circumstances surrounding the administration of the examinations weigh strongly in favor of their admissibility.

On the other hand, the fact that the polygraph evidence at issue here would be offered before a jury in an actual trial, as opposed to a judge in a pre-trial hearing as in *Posado*, does weigh in favor of exclusion. We note, however, that were this factor dispositive by itself, polygraph evidence would rarely be admissible under Rule 403 and the Fifth Circuit's explicit jurisprudential shift in

*Posado* would be practically meaningless with respect to jury trials.

Finally, turning to the last Rule 403 factor outlined in *Posado*, the court finds that there is a special need for the polygraph evidence in this case. The fact that Mr. Neck, the investigator with the State Fire Marshal's office, concluded that there was insufficient evidence to continue his investigation of plaintiffs provides some independent support for plaintiffs' explanation of their roles in the fire. Since the polygraph evidence would not be mere "tie-breaker" evidence then, it seems evident, following *Posado*, that this factor also weighs in favor of admissibility.

In sum, therefore, this court concludes after careful evaluation of the facts and circumstances of the polygraph evidence proffered in this case that plaintiffs may question Mr. Cook and Mr. Neck with respect to the polygraph examinations administered to plaintiffs. In particular, they may question Mr. Cook about his role in administering the examinations, the techniques and theories used in the examinations and the results of the examinations. They may also question Mr. Neck about his role in requesting and supervising the examinations for the Fire Marshal's office, his conclusions based on the examinations, as well as State Farm's role in the examinations, if any, and State Farm's awareness of the results of the examinations. We emphasize, however, that this ruling does not preclude the defendant from questioning the theory or techniques of polygraphy in general or their application in this case during cross-examination of Mr. Cook or Mr. Neck.

As a final matter, the court will allow plaintiffs 30 days from the date of this ruling to distribute an expert report on the results of the polygraph examination conducted by Mr. Cook and will allow defendant a reasonable time thereafter to present its own expert witness report based upon another examination of the plaintiffs, if it so desires.