Janet **BENNETT**, et al., Plaintiffs,

v.

**PRC PUBLIC SECTOR, INC. A/K/A PRC Public Management Services, Inc., et al., Defendants.**

**Civil Action No. H–93–0810.**

United States District Court,
S.D. Texas,
Houston Division.

Jan. 26, 1996.

Donald F. Hawbaker, Andrews Myers & Donaldson, Houston, TX, mediator.

Ronald M. Cohen, Cohen & Raymond, Houston, TX, Joe William Meyer, Meyer Knight Williams, Houston, TX, for plaintiffs Janet Bennett, Florine Carmouche, Carol Cummings, Diane Garcia, Tamara Jennings, Margaret Moser, Bobbie Van, Deloris Williams, Debbie Zaharis.

Joe William Meyer, Meyer Knight Williams, Houston, TX, for plaintiff Algene Garrett.

Jeffrey W. Hurt, Leonard Hurt and Parvin, Dallas, TX, for defendant PRC Public Sector Inc.

James E. Davis, Cozen & O'Connor, Dallas, TX, for defendant Console Systems, Inc. A/K/A Electrocom Systems Automation, Inc. ("CSI").

## ORDER GRANTING IN PART DEFENDANTS' MOTION IN LIMINE REGARDING EXPERT TESTIMONY

ATLAS, District Judge.

### I. INTRODUCTION

Defendant PRC Public Sector, Inc. a/k/a PRC Public Management Services, Inc. ("PRC") has filed a Motion in Limine [Doc. # 182] ("Motion") seeking exclusion of certain evidence to be presented by Plaintiffs' expert, Dr. Lawrence Schulze, on the grounds that the testimony fails to meet the standards of *Daubert v. Merrell–Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ("*Daubert*"), as well as because the testimony allegedly contains medical opinions that the witness is unqualified to present. Plaintiffs strenuously oppose the motion.[1]

The Court held a preliminary hearing on November 8, 1995, pursuant to *Daubert* and Federal Rule of Evidence 104. During the hearing, the Court received Plaintiffs' ten exhibits, some of which are scientific or medi-

---

1. Defendant PRC moved [Doc. # 172] to extend the Court's Rule 16 deadline for the filing of non-dispositive motions [Doc. # 160] in order to allow PRC to make this motion in limine, which it believed was necessitated by the recent completion of Dr. Schulze's deposition. The motion for an extension was granted [Doc. # 176].

On October 31, 1995, at a pretrial conference attended by all parties' counsel, PRC announced that it would be challenging Dr. Schulze's testimony as being without appropriate scientific basis. PRC served its motion in limine requesting the *Daubert* hearing on November 2, 1995, accompanied by a detailed memorandum of law setting forth its objections to Dr. Schulze's testimony. The Court set a hearing on the motion for November 9, in light of the parties' expressed desire for a firm trial date, Dr. Schulze's planned absence during the following six months, the congestion of the Court's calendar, the complexity of the motion, and the need to allow the Court adequate time to rule on the motion before the anticipated trial date. To accommodate Plain-

tiffs' counsel and the witness' schedules, the Court reset the hearing for November 8. The hearing lasted approximately six hours and all parties had an opportunity to introduce their evidence.

At the outset of the hearing, Plaintiffs' counsel for the first time expressed an objection to the scheduling of the hearing since he had not had 20 days to submit a responsive brief to the Court. This request was granted, and Plaintiffs were given until November 22 to file a response to the motion, with the caveat that if lead counsel for Plaintiffs was in fact called to trial in another matter, the submission date for Plaintiffs would be December 4. PRC was granted an opportunity to file a Reply. Transcript of Hearing on November 8, 1995 [Doc. # 198] (hereinafter "Tr."), at 187.

On November 22, Plaintiffs submitted their Response and Memorandum of Law in Opposition [Doc. # 194] to the motion. On December 11, 1995, PRC filed a "Post–Daubert Hearing Brief" [Doc. # 197], to which Plaintiffs have objected [Doc. # 199]. This objection is overruled.

cal articles to which Defendant now has objected because they are not peer-reviewed. The Court notes that peer review is not a requirement for admissibility, *Daubert,* 509 U.S. at 593, 113 S.Ct. at 2797, and declines to change its evidentiary rulings. This is in no way a comment as to whether or not the articles are peer-reviewed.

Plaintiffs are ten employees who worked in the Computer–Aided Dispatch ("CAD") System of the City of Houston Police Department ("HPD"). The CAD system was designed to enable the Houston Police Department to respond quickly to its "911" calls. Plaintiffs were among the HPD "911" call takers and dispatchers.[2]

Plaintiffs contend that Defendant PRC designed, promoted, marketed, distributed, sold, and installed the CAD system. *See* Joint Pretrial Order [Doc. # 201], at 3. PRC denies these contentions and asserts that it provided the system according to detailed specifications that were supplied by the HPD. *Id.* at 5.

Plaintiffs assert against PRC[3] claims of strict liability arising from the allegedly defective design and unreasonably dangerous condition of the CAD system.[4] Dr. Schulze's opinions largely relate to the design of what he calls the "console" or the "workstation" and the effects it allegedly caused to Plaintiffs. Plaintiffs argue that the system was designed with inherent risks and dangers to users arising from extended use, and such use was foreseeable and was contemplated by PRC. Plaintiffs also assert that PRC "failed to warn and/or adequately warn users and consumers ... of the risks of the defects in the machines and workstations," that PRC failed to instruct users concerning the proper

and safe use of the machines and work stations, that PRC was negligent in consulting and designing the work stations, and that PRC breached implied warranties of merchantability and fitness for their intended use. First Amended Complaint [Doc. # 74], ¶ 13; Joint Pretrial Order, at 3–4.

Plaintiffs allege that as a result of these wrongs by PRC they have sustained severe bodily injuries to the "muscles, tendons, vessels and soft tissue of their upper extremities," which include "carpal tunnel syndrome ['CTS'], thoracic outlet syndrome, reflect sympathic dystrophy, tendinitis, tenosynovitis, nerve ganglia, ulnar and median nerve compression and entrapment, fibrositis and causalgia." Joint Pretrial Order, at 4. Plaintiffs further state that most of them have undergone "extensive surgery and medical treatment" for their injuries, and that "no Plaintiff has successfully completed the treatment." *Id.* They also allege mental anguish, physical pain, disfigurement, impairment, medical expenses, and loss of earning capacity. *Id.*

Defendant PRC, in sum, denies that the workstations (or consoles) are defectively designed or unreasonably dangerous, deny that they caused Plaintiffs' injuries, and deny that there is any breach of implied warranties.

## II. *APPLICABLE LEGAL STANDARDS*

The parties largely agree on the applicable legal standards. They merely dispute those standards' application to Dr. Schulze's testimony. More specifically, it appears that the disagreement centers on whether Dr. Schulze's opinions on causation, unreasonably dangerous equipment and defective equipment

---

**2.** It appears that there were approximately 100 people working in similar positions. Tr. at 35, 155.

**3.** Plaintiffs assert very generalized claims against AllSteel, Inc., the supplier of the original chairs allegedly included in the CAD system. However, Plaintiffs' First Amended Complaint asserts no specific wrongdoing by AllSteel, Inc. and no proposed jury questions or definitions with respect to that claim have been submitted with Plaintiffs' proposed Pretrial Order. AllSteel, Inc. has filed a motion for summary judgment that Plaintiffs oppose. The Court will address that motion in a separate order.

**4.** In the Amended Complaint and the Joint Pretrial Order, Plaintiffs define the CAD System to include "computer keyboards, accompanying video display screens, work stations, software and hardware." First Amended Complaint, ¶ 6; Joint Pretrial Order, at 2–3. However, their expert's opinion does not address or criticize several of these components. The Court construes Plaintiffs' complaints to concern the CAD system's desk, keyboard stand and chairs, which Dr. Schulze refers to interchangeably as the "workstation" or "console."

are grounded in valid and appropriate scientific methodology.

■ Under *Daubert v. Merrell–Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court has made it clear that the "trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589, 113 S.Ct. at 2795.[5] The reliability inquiry is grounded in Federal Rule of Evidence 702, which requires that the expert testimony be admitted if it consists of "scientific, technical or other specialized knowledge," and that such knowledge is relevant in the sense that it "will assist the trier of fact to understand the evidence or to determine a fact in issue."[6] *Id.; U.S. v. Posado*, 57 F.3d 428, 432 (5th Cir.1995).

The first inquiry for this Court under Rule 702, therefore, is whether Dr. Schulze is qualified as an expert. *See* F.R.E. 702, 104(a). Next, the Court must assess whether or not the testimony Plaintiffs seek to offer qualifies as "scientific, technical or other specialized knowledge."

■ The Supreme Court noted in *Daubert* that the "scientific knowledge" requirement establishes a standard of evidentiary reliability. *Daubert*, 509 U.S. at 590, 113 S.Ct. at 2795. The Court stated that the "adjective 'scientific' implies a grounding in the methods and procedures of science," and that the "word 'knowledge' connotes more than subjective belief or unsupported speculation." *Id.* While there is no requirement that the subject of scientific testimony be "known" to

a certainty, "in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method." *Id.* All proposed testimony therefore must be supported by appropriate validation; in other words, there must be " 'good grounds', based upon what is known" supporting it. *Id.*[7]

■ The Fifth Circuit recently held that the *Daubert* requirements provide a "flexible" inquiry driven primarily by Federal Rules of Evidence 401, 402, 403, and 702. *Posado*, 57 F.3d at 432. Under Rule 104(a),[8] the trial judge must

> make initial determinations … that the proffered evidence possesses sufficient evidentiary reliability to be admissible as 'scientific, technical, or other specialized knowledge' and that the proffered evidence is relevant in the sense that it will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'

*Id.* at 432 (footnote omitted) (*citing Daubert*, 509 U.S. at 591–93, 113 S.Ct. at 2796). Whether evidence assists the trier of fact is essentially a relevance inquiry. *Id.* at 432–33 (*citing Daubert*, 509 U.S. at 589–93, 113 S.Ct. at 2795–96). In order to be "helpful" under Rule 702, the evidence must possess validity when applied to the pertinent factual inquiry. *Id.* at 433. The purpose for which the testimony is proffered must be evaluated. *Id.* at 433 & n. 4.

■ In addition, *Daubert* and *Posado* establish that to determine admissibility of experts' opinions, the party proffering the

---

**5.** This has been the prevailing view in the Fifth Circuit for some time. *See, e.g., Berry v. Armstrong Rubber Co.*, 989 F.2d 822 (5th Cir.1993), *cert. denied*, 510 U.S. 1117, 114 S.Ct. 1067, 127 L.Ed.2d 386 (1994); *Christophersen v. Allied–Signal Corporation*, 939 F.2d 1106 (5th Cir.1991) (en banc), *cert. denied*, 503 U.S. 912, 112 S.Ct. 1280, 117 L.Ed.2d 506 (1992); *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230 (5th Cir.1986).

**6.** Federal Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible." "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the

action more probable or less probable than it would be without the evidence." F.R.E. 401.

**7.** The Supreme Court noted that "scientists typically distinguish between 'validity' (does the principle support what it purports to show?) and 'reliability' (does application of the principle produce consistent results?)." *Daubert*, 509 U.S. at 590, 113 S.Ct. at 2795 n. 9 (citation omitted).

**8.** Federal Rule of Evidence 104(a) provides that "[p]reliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court." Such hearings are to be conducted out of the hearing of the jury "when the interests of justice require." F.R.E. 104(c).

evidence must establish its "evidentiary reliability" or trustworthiness. Thus,

> [f]or scientific knowledge, there should be proof that the principle supports what it purports to show, i.e., that it is valid.... Validity can be measured by several factors, including whether the theory or technique can be tested and whether it has been subjected to peer review or publication.... [T]he known or potential rate of error may be helpful in making the validity determination.... Finally, although it is not dispositive, the extent to which a particular theory or technique has received general acceptance may be relevant to whether it is scientifically valid.

*Posado*, 57 F.3d at 433 (*citing Daubert*, 509 U.S. at 589–95, 113 S.Ct. at 2794–98).

■ The Fifth Circuit, even before *Daubert*, urged trial judges to exercise their gatekeeper function:

> [T]he trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument.... Our customary deference [to trial judges] ... assumes that the trial judge actually exercised his discretion. In saying this, we recognize the temptation to answer objections to receipt of expert testimony with the shorthand remark that the jury will give it 'the weight it deserves.' This nigh reflexive explanation may be sound in some case, but in others it can mask a failure by the trial judge to come to grips with an important trial decision.

*In Re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1233 (5th Cir.1986).

■ Finally, in determining admissibility under Rule 702, the Court's focus is "solely on principles and methodology" of the expert, and not on the conclusions that such princi-

ples and methods generate. *Daubert*, 509 U.S. at 595, 113 S.Ct. at 2797.

■ In summary, it is agreed that expert testimony must be both reliable and relevant to meet the requirements of Federal Rules of Evidence 702, 701, 703 and 104(a) (reliability) and 401 and 702 (relevance). *Daubert*, 509 U.S. at 589–93, 113 S.Ct. at 2795–96; *see also* F.R.E. 104(b). The burden of proof is on the party proffering the witness, and admissibility must be shown by a preponderance of the evidence. *Id.*

### III. FACTUAL BACKGROUND

#### A. *The Expert Opinions in Issue*

Plaintiffs proffer Lawrence John Henry Schulze, Ph.D., as an expert in support of their claims.[9] Several opinions rendered by Dr. Schulze about Plaintiffs and their injuries are in issue in this motion. Defendants appear to seek exclusion of his testimony in its entirety.[10] The Court has closely reviewed Dr. Schulze's reports, his testimony at the hearing, the exhibits introduced at the hearing, the arguments of counsel, and the parties' briefs.

Dr. Schulze's conclusions set forth in his original report, entitled "Preliminary Report," are labeled Opinions "A," "B," "C" and "D". Plaintiffs' Exhibit # 3 ("Bennet[t] et al. vs. PRC Public Sector, Inc. Preliminary Report"). They are as follows:

#### 1. *Opinion A*

Opinion A, titled "Injuries to Plaintiffs" has been the focal point of most of PRC's criticism. It essentially consists of a summary of the bases for Dr. Schulze's opinion that the "CAD consoles installed by PRC ... are *the proximal cause* of the repetitive motion disorders affecting the plaintiff's [sic]."[11]

---

**9.** Dr. Schulze is unquestionably an expert in his field of ergonomics, and has published widely. *See* Plaintiffs' Exhibit # 1 (Dr. Schulze's curriculum vitae). PRC does not appear to contest his credentials as an ergonomist.

**10.** Dr. Schulze issued a Preliminary Report dated September 20, 1994 and an Addendum dated February 23, 1995. Plaintiffs did not introduce the Addendum into the record and it is unclear whether they are intending to offer the conclusions therein. Since Defendant PRC put the

Addendum into the record during the *Daubert* hearing, *see* PRC Exhibit # 2 ("Bennet[t] et al. vs. PRC Public Sector, Inc. Addendum Report"), the Court will address it briefly below.

**11.** Opinion A, in its entirety, is as follows:

· "Review of the physicians['] reports and personnel documentation indicates: (1) each of the plaintiffs was employed in the communications department at the Houston Police Department; (2) the plaintiffs incurred repetitive

Dr. Schulze's view is that the consoles are the "root cause, the primary cause of their injury." Tr. at 88. He based his view on the following: "the medical reports [and] the individuals' demographic information provided there"; his inspection of Plaintiffs' workstation "to determine that was the primary cause of their injury"; and, his analysis of Plaintiffs' "weight" and their "ethnic background" or "ethnic orientation." *Id.* at 88–89. As to Plaintiffs' off-work activities, he did not recall "the exact specific activities that were discussed" in the medical or workers compensation records. *Id.* at 90.

### 2. *Opinion B*

Opinion B, entitled "Ownership of the CAD Console Design," contains Dr. Schulze's conclusion, based on evidence apparently produced in discovery, "that the console specifications did not originate from the City of Houston, but originated from PRC Public Sector, Inc." Plaintiffs' Exhibit # 3, at 2. Dr. Schulze states that "[t]his is typically standard in the industry." *Id.*

### 3. *Opinion C*

Opinion C, entitled "Console Design," consists of a summary description of the consoles at which the Plaintiffs allegedly worked. Dr. Schulze concludes that the

> design of the CAD consoles was not state-of-the-art and did not incorporate known ergonomic principles of workstation design familiar to the industry at the time the CAD console design, negotiation, sale and installation occurred. The design configuration renders the CAD workstation unreasonably dangerous for its intended long-term and foreseeable [sic] long-term use during repetitious keyboarding activi-

---

motion disorders (carpal tunnel syndrome, epicondylitis, trigger finger, etc.) while employed in positions requiring the use of the CAD consoles installed by PRC Public Sector, Inc.; (3) The distribution of ages of the plaintiffs does not show a pattern of age and gender; (4) the activity all plaintiffs had in common was their assigned duties conducted at the CAD consoles installed by PRC Public Sector, Inc.; and (5) the CAD consoles installed by PRC Public Sector, Inc. are the proximal cause of the repetitive motion disorders affecting the plaintiff's [sic]."

ties. In summary, the design was and remains defective.

Plaintiffs' Exhibit # 3, at 3. This is the foundation for the Plaintiffs' strict liability claims.

### 4. *Opinion D*

Opinion D, entitled, "Statements by PRC ... Representative Mr. Galen Workman" consists of Dr. Schulze's opinion that it is "incomprehensible" for Mr. Workman, who was project manager for PRC and considered PRC to be a "leader in the industry," not to be aware of literature linking repetitive motion disorders to workstation design. Plaintiffs' Exhibit # 3, at 4–5. This conclusion essentially bolsters Dr. Schulze's "Opinion C".

### 5. *Addendum*

Dr. Schulze issued another report on February 23, 1995, *see* PRC's Exhibit # 2, containing brief additional opinions which disagreed with various statements by PRC's experts.

### B. *Dr. Schulze's Factual Bases For His Opinions*

Dr. Schulze visited the HPD room where Plaintiffs, call takers and dispatchers, worked at the PRC-supplied workstations. He spent approximately one and a half hours there, 45 minutes of which were spent measuring the workstations. Tr. at 105–06. He states that he was aware that both call takers and dispatchers used the CAD system. Dr. Schulze did not make any detailed on-site analysis of the CAD system in operation,[12] nor did he obtain access to a "mock up" of the workstation that apparently is now avail-

---

Plaintiffs' Exhibit # 3 (Preliminary Report), at 1.

**12.** Dr. Schulze stated that the City prevented him from videotaping the work in progress. Tr. at 36, 41, 106. Plaintiffs' counsel also noted that the City prevented the full examination that Dr. Schulze might have wanted. Tr. at 75. However, Plaintiffs' counsel apparently did not follow up with any requests for additional access. Furthermore, there was no attempt to remedy the problem through application to the Court.

able, and was known to him prior to the *Daubert* hearing.[13] *See id.* at 123.

■ Dr. Schulze then spent "at least four" hours reviewing the ten (10) Plaintiffs' medical and workers compensation records, of which he made one page of notes. Tr. at 164–65;[14] PRC's Exhibit # 5 (Dr. Schulze's notes). Dr. Schulze did not meet or interview any of the Plaintiffs;[15] he neither took nor obtained any measurements of them. *Id.* at 58–59. He did no analysis of potential work-related causes, such as the quantity of keystroking done in any day or other period, the force applied to keystrokes or the work breaks available. *See, e.g.,* Tr. at 34, 64–67, 72–75, 105, 114. Nor did he consider non-work factors, such as pregnancies, diabetes, gynecological surgeries, or thyroid disfunction. *Id.* at 101–04. He investigated neither Plaintiffs' personal histories, their psychological conditions or histories, nor their non-work activities. *Id.* at 105. He did not interview the Plaintiffs' doctors, *id.* at 105, physical therapists or families as to Plaintiffs' activities. To the extent such information was not referenced in the medical records, Dr. Schulze deemed this detail unnecessary to his conclusions. *Id.* at 104–05, 113–14. Dr. Schulze thus made no meaningful attempt to exclude other potential causes of the Plaintiffs' injuries. *See* Tr. at 35–36, 99–100, 105–06.[16] Furthermore, none of Plaintiffs'

medical records or the other materials pertaining specifically to Plaintiffs or their HPD jobs that Dr. Schulze allegedly reviewed were offered in evidence.

Dr. Schulze measured the workstations and chairs as they existed in 1993 when he was retained by Plaintiffs. He observed that the workstations' desks and keyboard heights were not adjustable, except insofar as they could be leveled on the floor, *e.g., id.* at 35, 40, but did not test the chairs. *Id.* at 41. However, when Plaintiffs' counsel explained that there was no dispute that the chairs' height can be adjusted by swivelling the seat or base, Dr. Schulze then stated that in his view the chairs were not "easily adjustable" and that workers would not make the adjustment, especially with their daily shift and workstation changes.[17] *Id.* at 40–41. He did not know when the original PRC-supplied chairs were replaced by HPD, or how long each Plaintiff used each type of chair. Based on his observation that certain chair arms were worn, he concluded that workers had a practice of pulling them up close to the desks, from which he deduced that the workstations were uncomfortable. *Id.* at 37.[18]

Dr. Schulze's concept of what tasks are entailed by each of the two jobs, call taker and dispatcher, was based exclusively on his

---

13. To the extent that Plaintiffs' counsel implies that, because discovery was closed in 1994, Dr. Schulze was precluded from relying on the mock up or later discovered information, this argument is rejected. Dr. Schulze's deposition was not taken until October 1995, at which time he had no qualms in submitting an updated resume because he deemed it relevant. It is clear that had Dr. Schulze or counsel for Plaintiffs believed the newly developed information was necessary or desirable, Plaintiffs could and should have sought leave to obtain access to it. The Court finds no need to excuse Plaintiffs' failure to do so.

14. Dr. Schulze's testimony was vague on this point. He stated he spent "[a]t least four [hours] if not longer" looking at records; he then added "I was at Mr. Meyer's office probably all day looking through medical records. I couldn't tell you how many hours." Tr. at 164.

15. Furthermore, although Dr. Schulze states that he read several depositions, he could not recall which ones they were. *Id.* at 68. There is no

evidence (or assertion by Plaintiffs) that the depositions he read were Plaintiffs' depositions. *Id.*

16. Plaintiffs argue that the burden is on Defendant PRC in asserting an affirmative defense to proffer evidence of these potential causes. Plaintiffs' Response and Memorandum of Law in Opposition to PRC's Motion in Limine Regarding Evidence of Plaintiffs' Expert for Failure to Meet *Daubert* and Other Standards [Doc. # 194] (hereinafter "Plaintiffs' Response"), at 14–15. While this argument is ultimately true when the issues are before the jury, the argument ignores the gatekeeping function of the Court as to what evidence is admissible at all.

17. However, since Dr. Schulze did not interview Plaintiffs, Tr. at 58, he did not determine what efforts Plaintiffs made in this regard.

18. The chairs with worn arms were replacements for the original chairs that AllSteel, Inc. supplied, according to Plaintiffs' Counsel's argument at a January 19, 1996 hearing.

brief visit to the HPD. Tr. at 58, 106. While it is possible he read a relevant deposition, *see* Tr. at 68, there is no evidence he interviewed anyone at HPD or elsewhere on this subject or otherwise made any detailed evaluations.

No attempt was made to do any statistical analysis of the frequency of CTS or other upper extremity ailments in the HPD CAD system workforce, or to make a comparison to other groups with the adjustable workstations that Dr. Schulze recommends. In sum, there was no effort to test his hypothesis in any way or to determine the rate of error associated with his analysis.

## IV. DISCUSSION

### A. Ergonomics and Dr. Schulze's Expertise

Ergonomics is a relatively new but recognized "science" that is continuing to develop. *See Hopkins v. NCR Corporation*, 1994 WL 757510, at *7 (M.D.La.1994) ("Ergonomics is defined as '[t]he science concerned with how to fit a job to man's anatomical, physiological, and psychological characteristics in a way that will enhance human efficiency and well-being' ") (*quoting* Taber's Cyclopedic Medical Dictionary, 669 (17th ed.1993)), *aff'd*, 53 F.3d 1281 (5th Cir.1995). *See also* Tr. at 18–21; Plaintiffs' Exhibit # 7 (K.H.E. Kroemer & Dr. Ing, *Office Ergonomics: Work Station Dimensions*, in *Industrial Ergonomics: A Practitioner's Guide* 187 (David C. Alexander et al., eds., 1985)); Plaintiffs' Exhibit # 8 (*Design, Practice, and Standards for VDT Equipment and Work*, in *Video Displays, Work, and Vision* 194 (National Academy Press) (publication year unavailable)); Plaintiffs' Exhibit # 9 (*Anthropometry and Biomechanics in VDT*

*Applications*, in *Video Displays, Work, and Vision* 129 (National Academy Press) (publication year unavailable)).

There clearly are now, and have been for years, recognized methods for evaluating the risks of equipment and jobs, and for associating each type of risk with certain potential physical injury. *See, e.g.*, Plaintiffs' Exhibit # 6,[19] first article (D. Rempel & S. Horie, *Effect of Wrist Posture During Typing on Carpal Tunnel Pressure*) (associating wrist extension angle during typing with CTS); Plaintiffs' Exhibit # 6, fourth article (D. Rempel & S. Horie, *Effect of Keyboard Wrist Rest on Carpal Tunnel Pressure*) (study suggests that wrist rests do not reduce carpal tunnel pressure); Plaintiffs' Exhibit # 7, at 191–98 (describing procedures for calculating proper seat height, table height, footrest height, eye height, and display height, as well as experiments with three different design strategies); Plaintiffs' Exhibit # 9 (discussing stress on spine and attempts to alleviate by manipulation of chair design, working height, and display position).

Dr. Schulze's expertise as an ergonomist is not in doubt.[20] Dr. Schulze's resume and the numerous articles he has written setting forth his opinions on the subject of ergonomics in the workplace are notable. *See* Plaintiffs' Exhibit # 1 (Dr. Schulze's curriculum vitae). However, his resume and his writings demonstrate that much of his experience has been consulting with clients as to how to construct safer workplaces. Tr. at 7–14, 19; Plaintiffs' Exhibit # 1. The work of planning prospectively is materially different from the analysis required to ascertain specific causes of injuries that have already occurred. Particularly when allocation of legal and possibly

---

**19.** Plaintiffs' Exhibit # 6 consists of five separate articles, all of which list David M. Rempel, M.D., as an author. For most of the articles, basic bibliographic information, such as journal title and date of publication, is missing. Furthermore, the articles are of minimal relevance. The second and third articles appear to be wholly irrelevant, since they discuss the effect on carpal tunnel pressure of lifting one-pound cans, both with and without wrist splints. The fifth article, discussing the use of splints for treating CPS, is also irrelevant. The first and fourth articles, although they discuss typing, are also of limited relevance. It is not known whether or not the

Plaintiffs used wrist rests, the subject of the fourth article, *see* Tr. at 129, nor is it known what wrist extension angle, as discussed in the first article, was used by Plaintiffs. *See id.* at 58–59.

**20.** Initially PRC argued that Dr. Schulze was unqualified to give medical opinions to diagnose Plaintiffs' injuries. Plaintiffs do not dispute this contention, and they do not proffer Dr. Schulze's testimony for such purpose. Plaintiffs' Response, at 3. Therefore, the Court need not and does not reach this issue.

substantial financial responsibility is in issue, there must be close adherence to scientifically reliable methodologies.

Dr. Schulze has failed to establish that he has applied recognized scientific principles to the chore at hand, namely to determine whether, as to each Plaintiff individually the PRC-supplied workstation caused them injury.

### B. *Dr. Schulze's Methodology Generally*

As to Dr. Schulze's Opinion A, on the alleged causes of the Plaintiffs' injuries, and Opinion C, on the alleged defective design of the workstations, Dr. Schulze's methodology was inadequate. It consisted of only: a superficial review of the ten Plaintiffs' medical and workers compensation records related to the injuries in issue; some measurements of the offending equipment (with uncertainty as to which chairs were used by the Plaintiffs); and a brief visual observation of certain workers performing the jobs in issue. This methodology is not consistent with the methodologies described by the authors and experts whom Dr. Schulze identifies as key authorities in the field.[21]

For example, the Court has reviewed closely the most readable and apparently comprehensive of Dr. Schulze's resources, the report published by the National Institute for Occupational Safety and Health ("NIOSH"), entitled *"Cumulative trauma disorders: A manual for musculoskeletal diseases of the upper limbs,"* on which Dr. Schulze appears to have relied heavily for his testimony.[22] The Preface states that this publication is designed to serve as a "general reference source" and "a manual that explain[s], with a minimum of technical language, the concept of CDTs, the parts of the body affected and the potential causes." Plaintiffs' Exhibit # 10, at *ix.* The NIOSH Report is heavily annotated with references to other works by authors to which Dr. Schulze referred in his testimony as authoritative.

Part I of the NIOSH Report consists of four chapters devoted to "recognizing cumulative trauma disorders." The author states that there is a growing prevalence of cumulative trauma disorders ("CTDs")[23] and that in

**21.** *See* Plaintiffs' Exhibit # 8 (*Design, Practice, and Standards for VDT Equipment and Work,* in *Video Displays, Work, and Vision* 194 (National Academy Press) (publication year unavailable)), at 197–98 (design of ergonomically satisfactory workstation must take into account characteristics and preferences of individual worker); Plaintiffs' Exhibit # 9 (*Anthropometry and Biomechanics in VDT Applications,* in *Video Displays, Work, and Vision* 129 (National Academy Press) (publication year unavailable)), at 129 ("*all* system components, that is, the display, the workplace furniture, the environment, and the work tasks and schedules must be fitted to each other, and all of them to the operator: none of these components can be considered independently") (emphasis original); Plaintiffs' Exhibit # 10 (*Cumulative trauma disorders: A manual for musculoskeletal diseases of the upper limbs,* (Vern Putz–Anderson, ed., Taylor & Francis 1988)) (hereinafter "NIOSH Report") (three methods are suggested in order to "determine whether the workers in a job, work group, plant, or company have symptoms of cumulative trauma," including not only "reviewing available records" but also "surveying the workers" and "analyzing jobs").

The Court notes that peer review is recognized as a factor when determining the admissibility of expert scientific testimony. *Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2797; *Wheat v. Pfizer,* 31 F.3d 340, 343 (5th Cir.1994). However, there is no reliable evidence or other indication that any of the material submitted by Plaintiffs was peer reviewed. When asked whether his theory regarding a causal connection between non-adjustability and upper extremity disorders had been peer reviewed, Dr. Schulze answered, "I have discussed it with my peers and I have gotten concurrence with my thoughts, if that is what you call peer reviewed." Tr. at 142–43. When PRC's counsel explained that she "was thinking more in terms of a journal or refereed journal," Dr. Schulze answered, "No, I have not discussed peer reviewed literature." *Id.* at 143. Plaintiffs' counsel agreed that defense counsel's definition of "peer review" was "a definition," but stated that he considered it too limited and that, in his opinion, there is not "one definitive definition." *Id.* at 147–48. He acknowledged that references to "peer review" by the Supreme Court and other courts may have been references to PRC's definition. *Id.*

**22.** Plaintiffs' Exhibit # 10 (NIOSH Report). Dr. Schulze's examples in his testimony are similar to those in this document. *Compare, e.g., id.* at 1 *with* Tr. at 19–20.

**23.** The NIOSH Report states that it uses the term "cumulative trauma disorder," or "CTD," to refer to those musculoskeletal impairments that *appear* to be work-related. The report further states:

A useful definition of CTDs can be constructed by combining the separate meanings for each

response "there has been renewed research interest in cause and prevention." *Id.* at 1. The author, writing in 1988, states that until "recently," CTDs "commanded comparatively little public attention." *Id.* The author then explains the complicated analysis that is required in evaluating CTDs:

CTDs belong to a collection of health problems that are considered to be work-related—that is, the disorders are more prevalent among working people than among the general population. As such, *work* is a risk factor for CTDs. A risk factor is any attribute, experience, or exposure that increases the probability of occurrence of a disease or disorder, *though it is not necessarily a causal factor.*

Work may serve as a **contributor** or **exacerbator** of an existing health problem or physical limitation. For example, work may be a factor in a disease with multiple etiologies, such as degenerative joint disease ... Work may also lead to an aggravation of an existing condition of non-occupational origin, such as joint pain ... from a previous sports-related injury....

A worker fatigued from lack of sufficient rest, or a worker who is recovering from an illness may also be more at risk of developing CTD than a rested or healthy worker....

Activities associated with the onset of CTDs arise from ordinary movements that may include repetitive gripping, twisting, reaching, moving, etc. These activities, by themselves, are no more hazardous at work than at home. What makes them hazardous is chronic repetition in a forceful and awkward manner without rest or sufficient recovery time ...

The difficulty in identifying the roles played by occupational and non-occupational factors in causing CTDs is further complicated by the role of personal factors or individual susceptibility. A worker's physical size, strength, prior injuries, and joint

alignment may contribute to injury or exacerbate the adverse effects of repeated microtrauma....

Regardless of the label and the origin, life activities, whether occurring in the home during leisure or at work, should be regarded as a continuum. With matters of health, there are seldom any firm boundaries that separate the work environment from the non-work environment.

*Id.* at 4–5 (endnote omitted) (first paragraph emphasis added). *Accord, id.* at 24–25 (emphasizing interrelationship of nonoccupational factors with occupational elements, making it difficult to sort out).

Part II of the NIOSH Report, entitled "Searching for Cumulative Trauma Indicators", addresses how to identify the causes of CTDs. There are three methods for evaluators to use: (1) reviewing available records, (2) surveying the workers, and (3) analyzing jobs. *Id.* at 31. The Report states that

[a]ny thorough program of CTD evaluation and control usually involves components of all three surveillance techniques. A systematic approach for investigating the causes of CTDs often begins at the records review stage and progresses through the survey stage, and if warranted, is followed up with a specific job analysis. Such a progression is useful in establishing a more precise definition of the cumulative trauma problem and usually provides ample information for devising appropriate methods of control.

*Id.* at 31–32. The report states in a chapter entitled "Analyzing Jobs" that:

Ideally, the analysis should include a method for measuring the worker's exposure to each of the biomechanical risk factors: force, posture, and repetition. The exposure should then be compared to known human capabilities to compute an injury probability. Since, however, there is limited dose-response data to establish a CTD

---

word. **Cumulative** indicates that these injuries develop gradually over periods of weeks, months, or even years as a result of repeated stresses on a particular body part. The cumulative concept is based on the theory that each repetition of an activity produces some trauma or wear and tear on the tissues and joints of

the body. The word **trauma** signifies bodily injury from mechanical stresses. And the term **disorders** refers to physical ailments or abnormal conditions.

Plaintiffs' Exhibit # 10, at 3–4 (endnotes omitted, emphasis original).

risk, a series of similar jobs may have to be analyzed to determine what are acceptable postures or safe levels of force and frequency.... A job analysis can be conducted in two ways. The first method is patterned after the traditional **work-methods analysis** and is particularly appropriate for new or unusually complex jobs. The second, and perhaps the most direct approach, is to use an ergonomic **checklist**.... To perform a work-methods analysis a complete task description is needed to catalogue work content....

*Id.* at 47 (emphasis original). Within the same chapter, the report further states that

If the goal is to identify risk factors for CTDs, then the checklist should be customized to include a list of the biomechanical risk factors. For each risk factor, specific job attributes should also be included to focus the effort.... The best solution is to customize existing checklists to meet the specific needs of different work sites ... Most ergonomic checklists will have items that cover the following four problematic work conditions:

(1) Crowding or cramping of the worker....

(2) Twisting or turning....

(3) Repeated reaching motions....

(4) Misalignment of body parts....

*Id.* at 51.

These concepts are repeated in the other exhibits offered by Plaintiffs in support of Dr. Schulze's opinions. *See, e.g.,* Plaintiffs' Exhibit # 5 (Phillip E. Wright II, *Carpal Tunnel and Ulnar Tunnel Syndromes and Stenosing Tenosynovitis, in Campbell's Operative Orthopaedics* 3445–43 (A.H. Crenshaw, M.D., ed., 1992)), at 3435 ("[t]rauma caused by repetitive hand motions has been identified as a cause of carpal tunnel syndrome, especially in patients whose work requires repeated forceful finger and wrist flexion and extension"); Plaintiffs' Exhibit # 7 (design strategies so as to encourage proper posture); Plaintiffs' Exhibit # 8, at 197 (for ergonomically satisfactory workstation design, multiple interactions between task, environment, and workplace elements must be considered, including the display and its support, keyboard and its support, work

seat, and needed leg space in which foot controls may be located; all elements must be integrated through the worker); Plaintiffs' Exhibit # 9, at 129 (the job, consisting of workplace design and task characteristics, must be analyzed along with the worker, who has both biomechanical/anthropometric factors and personal factors; unless a proper balance between job demands and worker capability is struck, there may be adverse health consequences).

The clear message the Court obtains from the Plaintiffs' exhibits is that the causation for individual's damages and the degree of various risks the workstations might possess can be measured, tested and analyzed. For this analysis to be scientifically valid (and thus legally reliable), the proper methodology is to analyze the job(s) in which the workstations are used and the particular individuals involved.

## C.  *Application of the Daubert Standard to the Opinions in Issue*

While neither party chose to parse Dr. Schulze's reports in any detail for the *Daubert* analysis, the Court believes this approach is necessary. The Court concludes that Plaintiffs have failed to establish that most of the opinions contained in Dr. Schulze's Preliminary Report meet the *Daubert* standards of reliability or relevance to the ultimate issues before the jury in this case, and therefore are inadmissible. The Addendum opinions are not controlled by *Daubert* and will be handled at trial.

### 1.  *Causation Opinion (Opinion A)*

Dr. Schulze's Opinion A, seeking to establish causation of Plaintiffs' injuries, is inadmissible because his theory is totally undefined and it is not founded in a valid scientific basis or methodology.

■ **a.  *What Was Dr. Schulze's Opinion?*—**The Court preliminarily notes that the expert and Plaintiffs' counsel were not "on the same page" with respect to what the expert's opinion was. The expert was clear in his report and in all his testimony elicited through non-leading questions that he be-

lieved "the root" or "the proximal" cause of Plaintiffs' injuries was the design of the consoles or workstations because they did not adjust to fit each worker with great precision. *E.g.*, Tr. at 31, 35, 40, 56, 88; *see* Plaintiffs' Exhibit # 3 (Preliminary Report), at 1, 3. Plaintiffs' counsel's attempts to reword Dr. Schulze's causation opinion to make it less limiting (*i.e.*, that the design was "a proximate cause"), and thus to attempt to more easily reconcile the opinion with the exhibits on which Dr. Schulze claims to have relied, cannot be condoned.[24] The issue before the Court is whether to admit the *expert*'s opinions and testimony into evidence. *See* F.R.E. 702, 703. The rule that counsel's questions and statements are *not* evidence is so fundamental that every jury charge contains such an admonition.[25] This is also true in preliminary hearings under Federal Rule of Evidence 104(a).

**b.** *Defects in Methodology and Scientific Bases.*—The Court finds on the record submitted that the methodology and scientific basis are lacking for Dr. Schulze's causation opinion.

Dr. Schulze identified several factors that allegedly were involved in causing the problems, *i.e.*, the degree of wrist deviation from a neutral position by the Plaintiffs and the "awkward" or leaning positions in which Plaintiffs allegedly worked due to the lack of adjustability of the workstation to each person's individual size. *See* Tr. at 36. He makes no attempt, however, to test or to scientifically validate the role of each or any one of these factors to determine which, if

any, actually is a "cause" of any of Plaintiffs' conditions.[26]

Dr. Schulze gave no specifications of what degree of leaning makes body posture "awkward" enough to have caused any injury. Even accepting his premise, he does not tie the issue of "awkward" posture to any of the various upper extremity ailments Plaintiffs are reported to suffer. His testimony that the workstations caused "certain individuals to be put in an awkward or unnatural posture . . . [that] *could* cause the type of injuries complained of in this case," Tr. at 36 (emphasis added), is only a vague basis for an opinion and lacks any meaningful empirical foundation.

To the extent his opinion can be construed to be that typists who work long hours with flexed or deviated wrists are more susceptible to injury such as CTS (a conclusion generally supported by Plaintiffs' exhibits), Dr. Schulze did not do any testing of his theory on PRC's workstations to determine its applicability. *See Wheat v. Pfizer, Inc.*, 31 F.3d 340, 343 (5th Cir.1994); *Hopkins v. NCR Corporation*, 1994 WL 757510, at *7 (M.D.La.1994), *aff'd*, 53 F.3d 1281 (5th Cir. 1995); *Stanczyk v. Black & Decker, Inc.*, 836 F.Supp. 565, 567 (N.D.Ill.1993). Nor did he produce any scientifically recognized studies that reach the categoric or blanket conclusion he asserts.

Dr. Schulze did not analyze (indeed, he intentionally disregarded) the degree of force involved in the keystroke repetitions that would be problematic,[27] or would affect the

---

**24.** Plaintiffs' counsel's questions and argument that Dr. Schulze's opinion was that the PRC equipment was "a" proximate cause, Tr. at 32, 55, or that the equipment "could" have caused the injuries, *id.* at 36, is not credited by the Court. Counsel's questions were leading in the extreme. *See, e.g., id.* at 35–36. The witness repeatedly stated his actual opinion on cross-examination. *See* Tr. at 88 ("the root cause, the primary cause of their injury"); *id.* at 89 ("the primary cause of their injury"); *id.* at 100 ("the proximate cause"). Moreover, Dr. Schulze's testimony that the equipment was "the" proximate or primary cause of Plaintiffs' injuries is consistent with his opinion set forth in Opinion A of his written report. Nevertheless, the Court's decision is intended to apply to either formulation of the opinion.

**25.** *See, e.g., U.S. v. Fierro*, 38 F.3d 761, 771 (5th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1431, 131 L.Ed.2d 312 (1995); *Matter of P & E Boat Rentals, Inc.*, 872 F.2d 642, 653 (5th Cir. 1989).

**26.** Indeed, Dr. Schulze's own testimony indicates that more individual assessment is routine. For example, his testimony of his study of law firms revealed that he interviewed and measured each individual who was in the job category. Tr. at 13–14.

**27.** *Compare* Tr. at 34 (Dr. Schulze stated that "the specific force in which somebody hits the key is not a determining factor of whether they are going to incur any type of upper extremity disorder"), *and id.* at 64–65 (Dr. Schulze did not

incidence of CTS or other similar injuries. He did not investigate the number of keystroke repetitions, even a "ballpark number," that Plaintiffs made in any specified period of time. *See* Tr. at 71–75. Dr. Schulze did no evaluation of the frequency of the necessary typing or its intensity or need for speed. *Id.* at 66, 105. Indeed, there is no evidence about whether the pace of the work being performed during Dr. Schulze's visit was typical or atypical, or an example of a busy or slow period. He also did not address how many repetitions would be likely to cause the Plaintiffs' injuries. *Id.* at 32–35, 66, 72.

By contrast, the literature on which he relies suggests that repetitive keystroking is a major work-related problem,[28] but indicates that quantifiable tests are feasible. Nothing submitted by Dr. Schulze quantifies the problem with respect to these Plaintiffs, or attempts even to address this issue. *Compare Hopkins*, 1994 WL 757510, at *10 (expert's opinion inadmissible because, among other things, outside authority relied upon factors which expert failed to consider, and expert can point to no scientific data or research supporting the causal link he posits).

Dr. Schulze did not ascertain how each Plaintiff sat at the desks or in the chairs, whether one or more of the Plaintiffs found the chairs comfortable for use at the workstations, whether Plaintiffs leaned back or sat upright without using the back of the chair at all, or whether they used a cushion or other aid to lean on while working.[29]

The Court has been presented with no checklists or diagrams describing or analyzing the specific physical motions needed for each job, or the frequency of each task.[30] In addition to the lack of information as to the keystroking noted above, there is no evidence whether Plaintiffs had breaks or variations in tasks that would relieve the problems repetitive keystroking may cause.

The record contains ample authoritative information that specific injuries are associated with particular jobs because those jobs typically require specific physical movements. *E.g.*, Plaintiffs' Exhibit # 10 (NIOSH Report), Table 1, at 22–23 (listing different jobs and common related disorders and occupational factors).[31] Dr. Schulze has

measure the amount of force necessary for use of the CAD system) *with* Plaintiffs' Exhibit # 10 (NIOSH Report), at 23–24 ("The force required to perform various occupational activities is also a critical factor in contributing to the onset of CTDs. The load or the pressure put on various tissues of the body can easily amount to hundreds of pounds.... Deprived of sufficient recovery time, soft tissue injuries will occur.... In general, acceptable limits of force on various parts of the body are conditioned by many variables. Age, sex, body build and general health all help determine the amount of force that is tolerable") (endnotes omitted).

**28.** *See, e.g.*, Plaintiffs' Exhibit # 10 (NIOSH Report), at 24 ("Jobs that require the worker to perform highly repetitive motions also contribute to the onset of CTDs. Specifically, the more repetitive the task, the more rapid and frequent are the muscle contractions. Muscles required to contract at a high velocity develop less tension than when contacting at a slower velocity for the same load. Hence, tasks requiring high rates of repetition require more muscles effort, and consequently more time for recovery, than less repetitive tasks. In this manner tasks with high repetition rates can become sources of trauma even when the required forces are minimal and normally safe") (endnotes omitted); cf. Plaintiffs' Exhibit # 6, first article.

**29.** *Compare* Tr. at 122 (Dr. Schulze was unaware of Plaintiffs' posture while at CAD consoles) *with*

Plaintiffs' Exhibit # 7 (discussing strategies for design of seat, table, footrest, and display so as to improve posture of worker), Plaintiffs' Exhibit # 8 (discussing design and use guidelines for chairs, as well as other workstation elements), and Plaintiffs' Exhibit # 9, at 142 ("[d]ifferent operators will select different postures and adjustments of workstation components, and the latter are dependent on each other").

**30.** By contrast, such checklists or diagrams are common in the authorities submitted by Plaintiffs. *See* Plaintiffs' Exhibit # 8, at 197–201 (lists general considerations for workstation design, including screen location, keyboard and support, writing surfaces, leg room, and hand, wrist, and arm supports; provides figures with design recommendations); Plaintiffs' Exhibit # 10, at 47–70 (job analyses can be conducted either by use of an "ergonomic checklist," or by "work-methods analysis," which requires a complete task description so as to catalogue work content).

**31.** It is interesting to note that the entry for "typing, keypunch, cashier" is said to relate to "tension neck, thoracic outlet and carpal tunnel," but not to De Quervain's disease, tenosynovitis, tendinitis of wrist and shoulder, or epicondylitis, which are listed for other jobs. Plaintiffs' Exhibit # 10, Table 1, at 22.

pointed the Court to nothing that establishes that the "call taker" or "dispatcher" jobs Plaintiffs have performed are within any specific category; he merely states that they use the keyboard without indicating any definitive information about the job tasks. Again, this is insufficient methodology. The jury should not be permitted to assume that "typist" or "cashier" positions are analogous without reliable evidentiary foundation. Even if such an assumption were permitted, the only direct evidence is in Plaintiffs' Exhibit # 10, Table 1, at 22, which does not include CTS as a likely reaction to those jobs. Therefore, Dr. Schulze's opinions on causation lack an empirical foundation. *See Wheat,* 31 F.3d at 343.

The material submitted by Plaintiffs also convinces the Court that there are multiple, well-recognized, non-work-related potential causes for CTDs.[32] Indeed, when shown the records of Plaintiff Bennett by Plaintiffs' counsel during the Hearing, Dr. Schulze had to be "spoon fed" through leading questions all the information concerning Ms. Bennett that Plaintiffs' counsel sought to elicit. Tr. at 174–78. Dr. Schulze's failure to meaningfully rule out or consider any of these factors is contrary to accepted methodology. *See id.* at 56–59, 72–75, 82–84. His one page of notes and brief review of the ten Plaintiffs' records are contrary to the recommendations of his authorities.

Furthermore, the material on which Dr. Schulze purports to rely for his opinion of causation, namely the medical records of Plaintiffs,[33] is not recognized in any of the literature submitted to the Court. To the contrary, the articles submitted establish that worker surveys, various job analyses, and detailed measurements of the workers and the equipment are the typical sources of information supporting ergonomists' opinions.[34]

Thus, Dr. Schulze's opinions are not based on facts or data "of a type reasonably relied upon by experts in [this] field in forming opinions or inferences upon the subject." *See* F.R.E. 703.

Finally, while "general acceptance" of a scientific theory is no longer a requirement for "reliability" and thus admissibility, the Court may consider the scientific community's reaction as one aspect of the reliability analysis. *Daubert,* 509 U.S. at 593–95, 113 S.Ct. at 2797. No authoritative literature was produced to the Court showing general acceptance in the scientific community of Dr. Schulze's view that "the proximal" or "the root" cause of Plaintiffs' injuries could be determined with the minimal information on which Dr. Schulze relied. While the authorities seem to agree that use of adjustable workstations may help to alleviate certain problems or minimize risks the jobs may have inherently, and thus may reduce the

32. *See, e.g.,* Plaintiffs' Exhibit # 5, at 3435 (obesity, diabetes mellitus, and thyroid disfunction are sometimes associated with CTDs); Plaintiffs' Exhibit # 10 at 24 (rheumatoid arthritis, hypertension, diabetes, thyroid disorders, kidney disorders, gout, alcoholism, pregnancy, use of oral contraceptives, and gynecological surgery and disorders can all predispose a person to CTDs); *id.* at 24–25 (non-occupational activities, such as athletics, that stress the musculoskeletal system can produce the same types of disorders as occupational activities; therefore it is often difficult to distinguish occupational CTDs from non-occupational conditions, and is necessary to closely monitor the working conditions and review all the symptoms reported by other workers doing a similar job); Plaintiffs' Exhibit # 8, at 200–201 ("[t]here are a number of potential health-related outcomes associated with psychosocial stressors . . . [such as] [l]ack of control, low social support, heavy (quantitative) workload, and underutilization of skills and abilities. . . . [T]hese stressors can affect mental and physical states").

33. Despite questions by PRC's counsel and the Court, Plaintiffs have *not* sought to introduce the Plaintiffs' medical records into evidence. Nor did they point out to the Court any places where meaningful information from Plaintiffs was reported as to their non-work activities or their health conditions or histories. Thus, the Court has received no admissible evidence as to the nature of the information on which Dr. Schulze relied in assessing causation of Plaintiffs' respective conditions.

34. *See, e.g.,* Plaintiffs' Exhibit # 8, at 200–13 (evaluation of jobs for psychosocial stressors); Plaintiffs' Exhibit # 9, at 135–38 (measurement of workers); Plaintiffs' Exhibit # 10, at 41–46 (worker surveys and questionnaires); *id.* at 47–60 (job analyses by "ergonomic checklists," or by "work-methods analysis," involving cataloguing of all tasks such as searching, grasping, reaching, holding, etc.); · *id.* at 61–70 (measurement and specifications of workstations and equipment).

**500**

incidence of work-related injuries, the material provided does not substantiate Dr. Schulze's views that the configuration of *all* non-adjustable workstations (which is his description of the PRC-supplied workstation) necessarily cause CTDs.[35] Indeed, all the literature indicated that far more evaluation of the individuals was necessary, and that the specific tasks within a job are the major factors in causing CTDs.[36]

■ **c.  No Relevance.**—PRC argues also that Dr. Schulze's testimony should be held inadmissible because it is based on such limited information about each of the Plaintiffs individually that there is no "fit" between Plaintiffs and Dr. Schulze's general theory. The Court agrees. *This conclusion is material to the "relevance" inquiry on the causation issue, i.e., that the testimony will assist the trier of fact in determining the issues before it,* F.R.E. 401, 702. Since Dr. Schulze's analysis completely lacks specificity as to any Plaintiff individually, it borders on sheer speculation and is therefore neither reliable nor relevant. *See Daubert,* 509 U.S. at 591, 113 S.Ct. at 2796 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility"); *Brown v. Parker–Hannifin Corp.,* 919 F.2d 308, 311–12 (5th

Cir.1990) (expert had incomplete data about the specific occurrence in question and, while expert's theory might have explained the occurrence, other theories explain it equally well; therefore, expert testimony amounts to speculation and is of no assistance to the jury, and was properly excluded by the trial court); *Viterbo v. Dow Chemical Co.,* 826 F.2d 420, 423–24 (5th Cir.1987) (expert testimony was unreliable because expert's data was incomplete in critical area); *Hopkins,* 1994 WL 757510, at *10 (the expert "can point to no scientific data or research that supports the alleged causal link between the characteristics of the [product] and CTS," and the court "can not hold that a causal theory based on such rank speculation is scientifically reliable").

Therefore, Dr. Schulze's opinions as to causation of Plaintiffs' injuries are inadmissible.

**2.  Defective Design Opinion (Opinion C)**

■ Dr. Schulze is of the opinion that the design of the PRC-supplied workstation or console is "defective" because it is "unreasonably dangerous for its intended long-term and foreseeable [sic] long-term use during repetitive keyboarding activities." Plain-

---

**35.**  On redirect, Plaintiffs' attorney called an article by Dr. Rempel to Dr. Schulze's attention, asking whether or not it referenced adjustability of a work station, and Dr. Schulze responded that it did.  Tr. at 170–71 (discussing Plaintiffs' Exhibit # 6, fourth article).  This article, however, does not support Dr. Schulze's theory that non-adjustability of a work station necessarily causes CTS.  Plaintiffs' attorney also called the expert's opinion to an article which states that "fitting diverse population ranges requires … varying adjustment ranges," and states that the seat, table, and display should all be independently adjustable.  *Id.* at 171–72 (discussing Plaintiffs' Exhibit # 7, at 197, 200).  Again, however, this article does not state that a work station may be considered the proximate cause of a worker's injuries merely because it is nonadjustable.  Plaintiffs' counsel also referred the expert to an article which is Exhibit # 18 of his deposition; however, this article is not part of the record for this hearing.

On recross, Dr. Schulze was asked whether, in the articles discussed during the hearing, he could cite "any that show a connection between fixed work stations or flexed wrist, anything else, epicondylitis, trigger finger, as opposed to Carpal

Tunnel Syndrome."  Dr. Schulze was not able to identify any such article, stating that he "would have to read through the articles to tell you if it has any of those in there."  Tr. at 180–81.  Furthermore, he was unaware of any research by Dr. Rempel or anyone else which shows a relationship between a certain degree of extension or flexion and the development of CTS.  *Id.* at 182.  Moreover, Plaintiffs' Response, filed after the *Daubert* hearing, offers no citations supporting Dr. Schulze's conclusion that nonadjustability was the proximal cause of Plaintiffs' injuries.  For example, the brief relies upon a report by Dr. Arndt, which states only that improper keyboard levels have been "associated" with an increased risk of disorders such as CTS and that it is an "advantage" if the keyboard and display are independently adjustable.  Plaintiffs' Response, at 8–9.

**36.**  *See supra* at 495, 496 n. 21.  There was no analysis of what rate of error might exist as to Dr. Schulze's theory that the workstations caused Plaintiffs' injuries and none can be determined since no testing has occurred.  *See Daubert,* 509 U.S. at 593–95, 113 S.Ct. at 2797; *Hopkins,* 1994 WL 757510, at *7.

tiffs' Exhibit # 3 (Preliminary Report), at 3.[37] Dr. Schulze appears to reach this conclusion because he finds that the workstation, designed and constructed between 1984 and 1987, was not "state-of-the-art and did not incorporate known ergonomic principles of workstation design familiar in the industry at the time the CAD console design, negotiation, sale and installation occurred." *Id.*

To the extent Dr. Schulze's defective design conclusion is based on his view that the design was not the "state-of-the-art," its relevance is questionable. Texas law does not require that a manufacturer or supplier of equipment supply only state-of-the-art items to avoid later liability under products liability theories. *Syrie v. Knoll International,* 748 F.2d 304, 307 (5th Cir.1984) (it is not required that "the design adopted be perfect, or render the product accident proof, or incapable of causing injury, nor is it necessary to incorporate the ultimate safety features in the product") (*quoting Acord v. General Motors Corp.,* 669 S.W.2d 111, 113 (Tex. 1984)). His reference to industry and governmental standards, however, is relevant as evidence of whether or not a product is defectively designed. *Lorenz v. Celotex Corp.,* 896 F.2d 148, 150–51 (5th Cir.1990); *Simien v. S.S. Kresge Co.,* 566 F.2d 551, 554 (5th Cir.1978). Nevertheless, it is not conclusive. *Davidson v. Stanadyne, Inc.,* 718 F.2d 1334, 1340 n. 9 (5th Cir.1983). Furthermore, Plaintiffs have not presented meaningful evidence establishing what sources or bases Dr. Schulze relied on for relevant industry standards at the time of the workstations' design and/or manufacture.[38]

The factual foundation for Dr. Schulze's opinion is undercut also by the fact that after PRC delivered and installed the workstations (and certain chairs), someone other than PRC added wrist rests and plywood under the keyboards. Tr. at 126–27. Plaintiffs' exhibits, such as the Rempel studies, establish that wrist rests when improperly used cause increased carpal tunnel pressure and thus increase the potential for CTS.[39] Plaintiffs have not established whether the workstation chairs were replaced with new chairs that were adjustable for height. It is unclear whether the original chairs also were adjustable in this manner.[40]

To the extent that Dr. Schulze's opinion that the workstation was "non-adjustable" was based on his disregard of the fact that most if not all the chairs were adjustable for height, at least when delivered, and his assumption that the damage to the arms (of the new chairs) meant that workers were uncomfortable and thus were sitting in "awkward" postures, these conclusions are nothing more than sheer speculation. They are therefore inadmissible as being without appropriate factual foundation. F.R.E. 602, 703. *See also* F.R.E. 401; *supra* at 492–493.

The evidence of record does not substantiate Dr. Schulze's views that workstations like the ones supplied by PRC were within the contemplation of the authors of the purportedly authoritative articles submitted. The distances of the writing surfaces from the worker, the operator's preferred height and distance for working, and the existence of forearm support are all factors to be considered, none of which are mentioned by Dr. Schulze. *See* Plaintiffs' Exhibit # 8, at 197–98. The interaction of the seat, keyboard, display and foot support are important, *id.* at

---

37. Under Texas law, a manufacturer is liable who sells a product in a defective condition that is unreasonably dangerous to the user or consumer, and whose product in fact causes harm to the user or consumer. *See McKisson v. Sales Affiliates, Inc.,* 416 S.W.2d 787, 788–89 (Tex. 1967) (adopting Restatement (Second) of Torts § 402A (1965)); *see also Morgan v. Compugraphic Corp.,* 675 S.W.2d 729, 732 (Tex.1984); *Dura–Stilts Company v. Zachry,* 697 S.W.2d 658, 662–63 (Tex.App.—Houston [1st Dist.], 1985, writ refused n.r.e.)

38. All of the articles on workstation design are either undated (Plaintiffs' Exhibits # 8 and 9) or post-date the workstations' construction, design and delivery (Plaintiffs' Exhibit # 10), except Plaintiffs' Exhibit # 7 which bears only a handwritten notation "1985".

39. *See* Plaintiffs' Exhibit # 6, fourth article, at C30 ("these preliminary findings indicate that use of wrist rests may increase the risk for developing CTS"). There is no evidence as to how each Plaintiff used the wrist rest, if at all.

40. There is no evidence as to how long the workstations, as originally designed, were used by the HPD or the Plaintiffs.

199, yet there is nothing in Dr. Schulze's report or testimony about his measurement or evaluation of these aspects. His view concerning the workstation design being unreasonably dangerous and therefore "defective" are nothing more than conclusory opinions without empirical foundation. *See Wheat*, 31 F.3d at 343; *Hopkins*, 1994 WL 757510, at *10.

The authorities in Plaintiffs' exhibits, as noted above, establish that use of "adjustable" workstations *may* help to alleviate certain problems or risks the *jobs* inherently may have and thus *may* reduce the incidence of work-related injuries. *See* Plaintiffs' Exhibit # 7 at 197–98; Plaintiffs' Exhibit # 8, at 197–200; Plaintiffs' Exhibit # 9, at 138–39; Plaintiffs' Exhibit # 10, at 89. It is clear that variations in the job are as important to worker health as the workstation design. *See, e.g.*, Plaintiffs' Exhibit # 10, at 85 ("[t]he guiding principle ... is to make the job fit the person, not to make the person fit the job"); Plaintiffs' Exhibit # 8, at 201 (discussing "a number of strategies for reducing workers' strain", including job rotation and rest breaks). The cited authorities also suggest that the specific tasks within each job being performed at the workstation is a major factor to be evaluated considering the appropriateness of the design of a workstation. *See* Plaintiffs' Exhibit # 10, at 47–70.

Some of Plaintiffs' exhibits also reveal that non-adjustable workstations, which are not defined with precision, are in common use.[41] These materials consistently recommend that the workforce be evaluated and that workstations then be obtained which can be reasonably adjusted to the workers. By implication, it is clear that in the mid-1980s the industry had not had wide exposure to this theory. *See, e.g.*, Plaintiffs' Exhibit # 9, at 138 ("[i]t is becoming standard practice to design to accommodate 90 percent of the population, disregarding the upper and lower

5 percent"; "[a]nthropometric tables are available for males and females"); Plaintiffs' Exhibit # 7, at 188–89 (discussing design for the fifth to ninety-fifth percentile, as well as other possible accommodation ranges). None of the authors state that a so-called non-adjustable workstation is unreasonably dangerous. Most significantly, the Court has not found any references in these materials to the concept that non-adjustable workstations are *per se* unreasonably dangerous or defective.

Finally, as to Dr. Schulze's opinion on the workstations' "defective design," there has been no peer review or publication of such a conclusion. While Dr. Schulze has published numerous papers, he acknowledged that none pertained to his conclusions as to Plaintiffs and PRC's or similar workstations. Tr. at 141–42.[42] While he stated that there is support in others' work for his theory, he further acknowledged that no studies furnished to the Court support his categoric conclusion.

Thus, the factual foundation of his opinion that the design of the PRC-supplied workstations was defective is inadequate. Therefore, Dr. Schulze's basis for arriving at his defective design conclusion lacks any recognized scientific methodology.

### 3. *F.R.E. 403 Analysis and Conclusion as to Opinions A and C*

Federal Rule of Evidence 403 requires a balancing of the potential probative value of disputed evidence against its potential prejudicial effect. The Court considers the opinions of a highly credentialed ergonomics expert to be probative evidence, in general, on causation or design defects. However, evidence by such an expert also can be extremely prejudicial. Where, as here, the probative value of Dr. Schulze's conclusions (Opinions A and C) is eviscerated because the conclusions are untested and

---

41. *See* Plaintiffs' Exhibit # 10 (NIOSH Report); Plaintiffs' Exhibit # 7. The NIOSH Report was prepared in 1988, and Dr. Schulze stated that the article in Exhibit # 7 was published in 1985. Tr. at 172. Exhibit # 7 makes it clear that detailed measurements of the workers are crucial to determination of whether a design is appropriate.

42. As noted above, *see supra* note 21, there is no evidence that any of the cited articles were published in peer-reviewed journals. Indeed, the context of the publication of virtually all of them is unspecified, the articles' dates are not noted in some, or they appear to be books of unknown prestige, review or use. *See, e.g.*, Plaintiffs' Exhibits # 6–9.

based on unreliable information, the probative value of the evidence is heavily outweighed by its prejudicial effect, and the evidence should not be considered by the jury.

Admission of this testimony would create a serious danger of confusing the issues or misleading the jury. Therefore, the Court will not receive in evidence at trial Opinions A and C of Dr. Schulze that the PRC-supplied workstations are "the" or "a" "proximal" or "proximate" cause of Plaintiffs' injuries,[43] or that the PRC-supplied workstations were and remain "unreasonably dangerous" and defective in their design at the time they left the manufacturer and entered the stream of commerce.

### 4. *Dr. Schulze's Other Opinions*

PRC appears to challenge Dr. Schulze's expert testimony in its entirety. Therefore the Court will address in general terms the other opinions he has rendered on behalf of Plaintiffs.

■ a. *Ownership of the CAD Console Design (Opinion B).*—Dr. Schulze disagrees in his Opinion B with PRC's evidence that the CAD system design was prepared by someone other than PRC. Plaintiffs' Exhibit # 3, at 2–3. Dr. Schulze states he has considered documents and deposition testimony of HPD and PRC witnesses, and thus purports to act as the trier of fact on this issue. This testimony from Dr. Schulze is inadmissible. Experts may testify to matters on which they have expertise or special knowledge and a factual foundation. F.R.E. 702. Testimony of a competent witness may be on an ultimate issue in a case. F.R.E. 704(a). However, the testimony must be relevant. F.R.E. 401. Dr. Schulze's opinion as to whether the CAD console was designed by HPD or PRC, or both, is not a matter that requires expert testimony. F.R.E. 702. His admitted lack of firsthand knowledge of the underlying facts renders him incompetent on this issue. F.R.E. 602. The credibility of the witnesses is a matter for the jury, not for expert opinion, *see* F.R.E. 702, and his lay

opinion on the matter is irrelevant. *See* F.R.E. 701.

To the extent the last sentence of Dr. Schulze's Opinion B consists of a description of industry practices as to creation of the specifications, no factual foundation has been shown. The Court declines to rule on this aspect of Opinion B at this time.

■ b. *Statement by PRC Representative Mr. Galen Workman (Opinion D).*— After reciting references to PRC representative Galen Workman's deposition, and compiling a list of articles related to CTS, computer workstation design, console design and related activities published between 1983 and 1985, Dr. Schulze concludes that because there were "a significant number of reports and journal articles ... during the time period between 1983 and 1985 that related repetitive motion disorders to workstation design [and] human factors," in addition to "one particular article published in the Wall Street Journal in December of 1990, [which] discussed the City of San Francisco's attempt to write [some standards for human factors engineering of CDT workstations] into law," it is "incomprehensible" for Mr. Workman, the "project manager" of PRC, "a leader in workstation design," to be unaware of such information. Plaintiffs' Exhibit # 3, at 5.

The relevance of this conclusion is unclear. Dr. Schulze's incredulity about Mr. Workman's knowledge is not relevant to any issue formulated by Plaintiffs in their Jury Questions submitted with the Joint Pretrial Order. To the extent the opinion is intended by Plaintiffs to support Dr. Schulze's Opinions A or C, it is no longer relevant.

To the extent Plaintiffs seek to introduce into evidence the list of articles compiled by Dr. Schulze and attached to his Preliminary Report, they must establish the relevance of the articles. The list itself is not relevant. Unless Dr. Schulze is genuinely familiar with the contents of an article, the article is in fact relevant to an issue before the Court, and Dr. Schulze is prepared to be cross-examined on the article, it may not be offered in evidence.

---

**43.** Dr. Schulze also will not be permitted to testify that the workstations are the "producing"    cause of Plaintiffs' injuries.

**504**

**c. Addendum Opinions.**—Finally, Dr. Schulze's Addendum Report consists of his opinions contradicting Defendant PRC's experts' reports or testimony. Plaintiffs may proffer Dr. Schulze's views on these matters at trial, if relevant.

## V. CONCLUSION

In holding that portions of Dr. Schulze's testimony as to Opinions A and C are inadmissible, the Court does not conclude that these opinions are necessarily false or inaccurate. Nor is the Court suggesting that reliable scientific evidence supporting Plaintiffs' claims may not exist. The Court holds simply that it does not have before it expert opinions derived using scientifically reliable methodologies. Therefore, Plaintiffs have not established that Opinions A and C meet the standards of reliability and relevance articulated in under *Daubert.* Therefore it is

**ORDERED** that Defendants' **Motion in Limine** is **GRANTED IN PART.** Dr. Schulze's Opinions A, C, D and all but the last sentence of Opinion B, are excluded. The Court reserves decision on the Addendum, the last sentence of Opinion B, and the list of articles attached to the Preliminary Report until trial, when the foundation of the opinions and their relevance may be assessed in context.